FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF GEORGIA**

MAY - 1 2009

**ATLANTA DIVISON**

JAMES N. HATTEN, CLERK
By: _____ Deputy Clerk

| | |
|---|---|
| BERNICE JACKSON, individually and on behalf of all persons similarly situated, | CIVIL ACTION NO: |
| *Plaintiff* | COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AGAINST U.S. GOVERNMENT |
| United States Department of Health and Human Services The National Institutes of Health The National Cancer Institute The U.S. Government | |
| And | AND |
| R.J. REYNOLDS TOBACCO COMPANY 401 North Main Street Winston-Salem, North Carolina 27102 | COMPLAINT FOR DAMAGES AGAINST TOBACCO COMPANIES |
| directly and as successor by merger to BROWN & WILLIAMSON TOBACCO CORPORATION 500 Brown & Williamson Tower Louisville, Kentucky, 40202 | |
| directly and as successor by merger to AMERICAN TOBACCO COMPANY 1500 Brown & Williamson Tower Louisville, Kentucky, 40202 | PLAINTIFF DEMANDS A TRIAL BY JURY AGAINST THE TOBACCO COMPANIES |
| directly and as successor to the Tobacco interests of AMERICAN BRANDS, INC. 700 East Putnam Avenue Old Greenwich, Connecticut 06870; | |
| ALTRIA GROUP, INC. CT Corporation System 4701 Cox Rd, Suite 301 Glen Allen, Va. 23060-0000 | |
| directly and as successor to the Tobacco interests of | |

# 1 09-CV-1196

- 1 -

PHILIP MORRIS COMPANIES, INC.                *
20 Park Avenue                               *
New York, New York 10017                     *
                                             *
LORRILLARD TOBACCO COMPANY                   *
327 Hillsborough St.                         *
Raleigh NC 27602                             *
       *Defendants*                          *
**********************************************************************

**COMPLAINT UNDER THE ADMINISTRATIVE PROCEDURE ACT FOR
INJUNCTIVE AND DECLARATORY RELIEF TO ORDER THE NATIONAL CANCER
INSTITUTE TO RECOMMEND SPIRAL CT SCREENING FOR THE EARLY
DETECTION OF LUNG CANCER
AGAINST U.S. GOVERNMENT**

**AND**

**CLASS ACTION COMPLAINT UNDER THE RACKETEERING INFLUENCED
CORRUPT ORGANIZATIONS ACT, THE MAIL AND WIRE FRAUD ACTS,
THE BRIBERY OF A PUBLIC OFFICIAL ACT,
AND GEORGIA PUNITIVE DAMAGE LAW
AGAINST TOBACCO COMPANIES
(EXHIBITS 1 – 263)**

## INTRODUCTION

1.     This is an action for injunctive and declaratory relief to compel the National Cancer

Institute ("NCI") to recommend Spiral CT Screening for the early detection of lung cancer for

persons like plaintiff who are at high risk for lung cancer.

2.     This is also an action to recover the damages to plaintiff's business and property caused

by the tobacco defendants' tortuous conduct and to deter the tobacco defendants from engaging

in similar unlawful conduct in the future.

3.     This action is also brought against the Government defendants under the Administrative

Procedure Act Title - 5 U.S.C. § 702 *et seq.*

4.      This action is also brought under the civil provisions of Chapter 96 of Title 18, United States Code, codified at 18 U.S.C. §§ 1961 through 1968 entitled: Racketeer Influenced and Corrupt Organizations (RICO) against the tobacco defendants.

5.      The tobacco defendants are the same tobacco defendants as were in the Louisiana medical monitoring class action, *Scott v. American Tobacco Company, Inc.*, 949 So.2d 266 (La.App. 4 Cir. 6/9/03).  The tobacco defendants have manufactured and marketed almost all of the cigarettes purchased in this country and have for many years deceived the American public about the health effects of smoking.  The tobacco defendants repeatedly and consistently denied that smoking cigarettes caused disease, even though they have known since 1953 that smoking increases the risk of disease and death.  The tobacco defendants repeatedly and consistently stated that they did not market cigarettes to children and the tobacco defendants also chose not to produce and sell less hazardous cigarette products.

### The Tobacco Enterprise

6.      In all relevant respects, the tobacco defendants acted in concert with each other to further their fraudulent scheme.  Beginning not later than 1953, the tobacco defendants, their various agents and employees, and their co-conspirators, formed the tobacco enterprise as that term is defined in 18 U.S.C. § 1961(4).  The tobacco enterprise has functioned as an organized association-in-fact for more than 45 years to achieve, through illegal means, the shared goals of maximizing their profits and avoiding the consequences of their actions.  Each defendant has participated in the operation and management of the tobacco enterprise, and has committed numerous acts to maintain and expand the tobacco enterprise.

7.      In order to avoid discovery of their fraudulent conduct and the possibility that they might be called to account for their conduct, the tobacco defendants engaged in a widespread scheme to

frustrate public scrutiny by making false and deceptive statements and by concealing documents and research that they knew would have exposed their public campaign of deceit. This scheme included making false and deceptive statements to the public and in congressional, judicial, and federal agency proceedings. (See *U.S. v. Philip Morris USA, Inc.,* 449 F.Supp.2d 1, RICO Bus.Disp.Guide 11, 26 (D.D.C. Aug, 17, 2006)(NO. CIV. A. 99-2496 (GK)), Judge Kessler.

### The tobacco defendants engaged in another RICO conspiracy

8.      As a consequence of the tobacco defendants' RICO conspiracy, a class action was brought in Louisiana to compel the tobacco defendants to pay for Spiral CT screening to detect lung cancer for the victims of the tobacco defendants' RICO conspiracy. In order to save money and not pay for Spiral CT screening, the tobacco defendants engaged in another RICO conspiracy.

### The racketeering activity

9.      The tobacco enterprise through the mails and wires, hired Dr. Denise Aberle, a Government Official and the National Principal Investigator of the National Cancer Institute's (NCI's) lung cancer random clinical trial (NLST), as an expert witness to testify for the tobacco defendants and against Spiral CT screening for the victims of the tobacco defendants' RICO conspiracy in the *Scott* Louisiana medical monitoring class action, so the tobacco defendants would not have to pay for Spiral CTs and would save money. The tobacco enterprise also paid Dr. Aberle a witness fee. As a direct result of the tobacco defendants' influence upon Dr. Aberle, the NCI and Dr. Aberle have not recommended Spiral CTs to screen for lung cancer as public policy and the medical standard of care.

### Plaintiff and class members were denied the right to control how their money was spent

10.     Plaintiff and class member residents of Georgia, who were at high risk for lung cancer and covered by a medical insurance company, HMO, Medicare, Medicaid or other third party payor, were denied the right to have their third party payor pay for their Spiral CT. They were denied the right to control how their money was spent, a property right, not an intangible right. Plaintiff and class members suffered a direct injury as a result of the loss of the payment of their Spiral CTs by their third party payor.  The loss of payment for medical expenses is damage to plaintiff's business or property.

11.     The tobacco defendants perpetrated a fraud on the plaintiff and class members causing them economic damage.

### Plaintiff and class members were denied the truth from the NCI

12.     The tobacco defendants participated in NCI's refusal to recommend Spiral CTs to detect lung cancer at stage 1 disease (1 centimeter) for the victims of the tobacco defendants' RICO conspiracy and directly caused injury to plaintiff's and class members' business and property in the state of Georgia.   Defendants interfered with the plaintiff's and class members' right to receive truthful information from the NCI.  And the tobacco defendants manipulated the NCI under the Federal Bribery Statute.

13.     NCI:  Observational studies show survival benefits from Spiral CT screening.

### The NCI was told to change its policy of relying solely on random clinical trials (RCTs)

14.     Spiral CT detects lung cancer at stage 1 disease (1cm). The NCI does not recommend Spiral CT to detect lung cancer.  Instead, the NCI is conducting a random clinical trial (RCT) to measure mortality benefits from detecting lung cancer at stage 1 disease (1cm).  On October 20, 1994, Congress, through the House of Representatives Committee on Government Operations, in its Sixteenth Report, *Misused Science: The National Cancer Institute's Elimination of*

*Mammography Guidelines for Women in their Forties,* told the NCI to change its policy of relying solely on RCTs measuring mortality benefits, when determining cancer screening guidelines. (*Misused Science,* p. 16)(Ex. 64 – 76, 74 - 75).

### So the tobacco defendants would save money

15.     The tobacco defendants knew that if the Dr. Aberle and the NCI did not recommend Spiral CTs to detect lung cancer at stage 1 (1cm) disease, a state court jury would be more likely to vote that the tobacco defendants' did not have to pay for Spiral CT screening for the victims of the tobacco defendants' RICO conspiracy.

16.     On July 23, 2003, the tobacco defendants argued to the state court jury in *Scott* that the tobacco defendants should not have to pay for Spiral CTs because Dr. Aberle and the NCI did not recommend them.   The tobacco defendants argued to the *Scott* state court jury that no public organization or government agency recommended Spiral CT.

### The goal of screening

17.     Dr. Aberle: "The goal of all screening, prostate, cervical, breast and colon cancer, is if we find it early, we have greater options to do things. And there is the greatest potential and greatest chance to cure." Transcript: *Scott v. American Tobacco Company, Inc.*, 949 So.2d 1266 (La.App. 4 Cir. 6/9/03).

### The Fraud against plaintiff and class members by tobacco defendants

18.     For Dr. Aberle and the NCI to conduct a random clinical trial to measure mortality benefits from detecting lung cancer at stage 1 (1cm), rather than to recommend Spiral CT screening as public policy, is a fraud on the plaintiff and class members, the victims of the tobacco defendants' RICO conspiracy.

## JURISDICTION

### Government Defendants

19.     Subchapter III of Title 42 of the U.S. Code provides that statutory framework for the

formation of the National Research Institutes, one of which is the National Cancer Institute,

created under Part A, 42 U.S.C. §§ 281 – 286g.  The NCI is a division of the National Institutes

of Health (NIH), which is composed of ten other institutes and various support divisions, all

dedicated to research and development activities in the area of public health and welfare.  NIH is

in turn a component of the Public Health Service, a part of the Department of Health, Education

and Welfare.  The Government defendants are hereinafter referred to as the NCI.  This court has

jurisdiction over the subject matter of this action under Title 28 U.S.C. § 1331 (federal question)

the Administrative Procedure Act – Title 5 U.S.C § 702; and Title 42 U.S.C. § 285, 285a, 285a-

1, 285a-2, 300u, 300u-1, 300u-2, 300u-3, 300u-4, 300u-5 and 300u-6.

### Venue - NCI

20.     The Administrative Procedure Act ("APA") waives sovereign immunity for suits seeking

relief other than money damages from federal agencies and officials. Venue is proper in this

District under 28 U.S.C. § 1391(e). A substantial part of the events or omissions giving rise to

the claim occurred in the Northern District. The plaintiff resides in the Northern District and the

NCI is present and does business in the Northern District of Georgia.

### Jurisdiction – the tobacco defendants

21.     Jurisdiction in this action is predicated upon 28 U.S.C. §§ 1331 Federal Question, 28

U.S.C. § 1332(c) diversity of citizenship, and 18 U.S.C. § 1964(c) and (d) the Racketeering

Influenced Corrupt Organizations Act;  18 U.S.C. § 201 the Bribery of Public Officials Act;  18

U.S.C. § 1341 the Mail Fraud Act;  18 U.S.C. § 1343 the Wire Fraud Act,   18 USC §  1346, the

Intangible Right to Honest Services Act; Federal Rule of Civil Procedure 23; and Georgia punitive damage law O.C.G.A. § 51-12-5. This claim also exceeds the amount of seventy-five thousand dollars ($75,000.00).

## Venue – the tobacco defendants

22.     Venue for this action is predicated upon 18 U.S.C. § 1965 and 28 U.S.C. §§ 1391 (b) and (c).  Plaintiff invokes the expanded service of process provisions of 18 U.S.C. § 1965(b).  Each defendant tobacco company, or its predecessor or successor, has marketed cigarettes for sale in the Northern District of Georgia.

## THE PARTIES

23.     The NCI is responsible for publishing and recommending lung cancer screening guidelines that are the standard of care.

24.     Plaintiff and class members are/were residents of Georgia on or after June 2000, covered by a third party medical insurance payor and at a high risk for lung cancer.  Plaintiff is over the age of 50 and has been smoking a pack of cigarettes per day for more than 20 years.  Plaintiff is at high risk for lung cancer.  On March 9, 2009, plaintiff contacted Ms. Shane, a representative for her insurance company, Aetna, and requested that Aetna pay for her Spiral CT to detect lung cancer.  Aetna's representative told plaintiff to review Aetna's policy protocol on its website.  Plaintiff read Aetna's lung screening policy protocol posted on Aetna's website. (Ex. 15 – 28).  On March 17, 2009, plaintiff confirmed by letter facsimile to Ms. Shane, the Aetna representative, that Aetna considers Spiral CTs to be experimental and investigational and that Aetna would not pay for her Spiral CT.  (Ex. 13, 14).  Plaintiff did not receive a response from Aetna to her March 17, 2009 facsimile.  On April 24, 2009, Plaintiff paid for her own Spiral CT to detect lung cancer early. (Ex. 29).  The Spiral Ct was preformed a St. Joseph's Hospital in

Atlanta Georgia.   (Ex. 30 – 34)   St. Joseph Hospital's website confirmed that insurance companies do not pay for Spiral CT screening to detect lung cancer for persons at high risk. (Ex. (Ex. 30, 33).   Plaintiff has suffered economic damage because the NCI does not recommend Spiral CTs to detect lung cancer early at stage 1 (1 centimeter) for the victims of the tobacco defendants' RICO conspiracy.

25.      Plaintiff has suffered an actual injury in fact, that is concrete and particularized, that is traceable to the NCI's final agency action and the injury will be redressed by a favorable decision.   When the NCI recommends Spiral CT screening for persons at high risk for lung cancer, Aetna and third party payors must pay for plaintiff's  and class members' annual Spiral CT screening.

26.      All defendants were the same defendants as in the Louisiana medical monitoring class action, *Scott v. American Tobacco Company, Inc.,* 949 So.2d 1266, (La.App. 4 Cir. 2/7/07).

## R.J. REYNOLDS TOBACCO COMPANY

27.      Defendant, R.J. REYNOLDS TOBACCO COMPANY ("REYNOLDS" or "RJR"), is a North Carolina corporation with it principal place of business at 401 North Main Street, Winston-Salem, North Carolina.   At relevant times, Reynolds has manufactured, advertised, and sold cigarettes, including Best Value, Bright Rite, Camel, Century, Doral, Magna, Monarch, More, Now, Salem, Sterling, Vantage, and Winston brand cigarettes throughout the United States, including the Northern District of Georgia.   At times pertinent to this Complaint, Reynolds individually and through its agents, alter egos, subsidiaries, divisions, or parent companies, materially participated in the Tobacco enterprise, and conspired, assisted, encouraged, and otherwise aided and abetted one or more of the other defendants in the

unlawful, misleading, and fraudulent conduct alleged herein, and has affected foreign and interstate commerce in the United States including the Northern District of Georgia.

## BROWN & WILLIAMSON TOBACCO CORPORATION

28.    BROWN   &   WILLIAMSON   TOBACCO   CORPORATION   ("BROWN   & WILLIAMSON) was a Delaware corporation with its principal place of business at 1500 Brown & Williamson Tower, Louisville, Kentucky.  BROWN & WILLIAMSON was a wholly owned subsidiary, directly or indirectly, of BATUS Holdings, Inc., a Delaware corporation, and its ultimate parent company is defendant, BRITISH AMERICAN TOBACCO, P.L.C.  At relevant times, BROWN & WILLIAMSON manufactured, advertised, and sold cigarettes, including Barclay, Bel Air, Capri, Eli Cutter, GPC, Kool, Laredo, Prime, Private Stock, Raleigh, Richland, Summit, Tall, Tareyton, and Viceroy brand cigarettes throughout the United States including the Northern District of Georgia.  As a result of the acquisition of defendant AMERICAN TOBACCO COMPANY in 1994 (either directly or through BAT Industries, P.L.C. the predecessor to BRITISH AMERICAN TOBACCO, P.L.C.) BROWN & WILLIAMSON has succeeded to the liabilities of defendant AMERICA either by operation of law, or as a matter of fact.  In July of 2004, BROWN & WILLIAMSON merged its U.S. operations with R.J. REYNOLDS TOBACCO COMPANY.  R.J. REYNOLDS TOBACCO COMPANY is now the parent company of BROWN & WILLIAMSON.

29.    At times pertinent to this Complaint, BROWN & WILLIAMSON, individually and through its agents, alter egos, subsidiaries, divisions, or parent companies, materially participated in the Tobacco enterprise, and materially participated, conspired, assisted, encouraged, and otherwise aided and abetted one or more of the other defendants in the unlawful, misleading, and

fraudulent conduct alleged herein, and has affected foreign and interstate commerce in the United States, including the Northern District of Georgia.

## AMERICAN TOBACCO COMPANY

30.     Defendant the AMERICAN TOBACCO COMPANY ("AMERICAN") was a Delaware corporation with its principal place of business at 1500 Brown Williamson Tower, Louisville, Kentucky. At all relevant times, AMERICAN manufactured, marketed, and sold American, Bull Durham, Carlton, Iceburg, Lucky Strike, Malibu, Misty, Montclair, Newport, Pall Mall, Silk Cut, Silva Thins, Sobrania, and Tareyton cigarettes throughout the United States and the Northern District of Georgia.

31.     AMERICAN was a successor to the tobacco interest of AMERICAN BRANDS, INC. In 1994, AMERICAN was purchased by and merged into BROWN & WILLIAMSON, which has succeeded to the liabilities of AMERICAN. At times pertinent to this Complaint, AMERICAN, individually and through its agents, alter egos, subsidiaries, parent companies and divisions, materially participated in the Tobacco Enterprise, and materially participated, conspired, assisted, encouraged, and otherwise aided and abetted one or more of the other defendants in the unlawful, misleading, and fraudulent conduct alleged herein, and has affected foreign and interstate commerce in the United States, including the Northern District of Georgia.

## ALTRIA GROUP, INC.

32.     Defendant, ALTRIA GROUP, INC., is a Virginia corporation based in Henrico County Virginia, and is the parent company of Philip Morris USA. On January 27, 2008, PHILIP MORRIS COMPANIES, INC. changed its name to Altria Group, Inc. ALTRIA GROUP, INC. owns 100% of PHILIP MORRIS USA.

## PHILIP MORRIS USA, INC.

33.     Defendant PHILIP MORRIS USA, INC. ("PHILIP MORRIS") is a Virginia corporation with its principal place of business at 120 Park Avenue, New York, New York.  PHILIP MORRIS is a subsidiary of PHILIP MORRIS COMPANIES, INC. At relevant times, PHILIP MORRIS has manufactured, advertised, and sold cigarettes, including Alpine, Basic, Dunhill, Benson & Hedges, Cambridge, English Ovals, Galaxy, Marlboro, Merit, Parliament, Philip Morris, Players, Saratoga, and Virginia Slims brand cigarettes throughout the United States, including the Northern District of Georgia.

34.     In addition, on or about January 12, 1999, PHILIP MORRIS entered into an agreement with LIGGETT GROUP, INC. to purchase certain brands of cigarettes previously manufactured by Liggett, including Lark, Chesterfield, and L&M, which Philip Morris also sold throughout the United States and the District of Columbia.  At times pertinent to this complaint, Philip Morris, individually and through its agents, alter egos, subsidiaries, divisions, or parent companies, materially participated in the Tobacco enterprise, and materially participated, conspired, assisted, encouraged, and otherwise aided and abetted one or more defendants in the unlawful, misleading, and fraudulent conduct alleged herein, and has affected foreign and interstate commerce in the United States and the Northern District of Georgia.

## LORILLARD TOBACCO COMPANY, INC.

35.     Defendant, LORILLARD TOBACCO COMPANY, INC., ("LORILLARD") is a Delaware corporation with its principal place of business at 1 Park Avenue, New York, New York.  LORILLARD is a subsidiary of Loews Corporation, a Delaware corporation.  At relevant times, LORILLARD has manufactured, advertised, and sold cigarettes, including Golden Lights, Harley-Davidson, Heritage, Kent, Maverick, Max, Newport, Newport Red, Old Gold, Satin,

Spring, Spring Lemon Lights, Style, Triumph, and True brand cigarettes throughout the United States, including the Northern District of Georgia.   At times pertinent to this Complaint, Lorillard, individually and through its agents, alter egos, subsidiaries, divisions, or parent companies, materially participated in the Tobacco Enterprise, and conspired, assisted, encouraged, and otherwise aided and abetted one or more of the other defendants in the unlawful, misleading, and fraudulent conduct alleged herein, and has affected foreign and interstate commerce in the United States including the Northern District of Georgia.

### Lung cancer is the leading cause of cancer death

36.     The death rate from lung cancer, unlike the death rate from other cancers has not declined. Lung cancer, which is most frequently caused by cigarette smoking, is the leading cause of cancer-related deaths in the United States. "Lung cancer is the leading killer of women in this country." (*U.S. Senator Barbara Mikulski*, U.S. Senate Subcommittee Hearing, 2002)(ex. 263). Lung cancer was predicted to kill 162,460 people in 2006. Lung cancer kills more people than cancers of the breast, prostate, colon, and pancreas combined. There are an estimated 91.5 million current and former smokers in the United States, all of whom are at high risk of lung cancer.

### Lung cancer is usually diagnosed by symptoms

37.     Dr. Aberle: "Currently lung cancer is usually diagnosed when it causes symptoms, and by that time the prognosis is very poor. Usually, a patient appears in a doctor's office: coughing, coughing up blood, complaining of chest pains, with symptoms of chronic bronchitis, or chronic pneumonia. Generally cancers that are symptom-detected are later stage than if they are detected in the absence of symptoms." Transcript: *Scott v. American Tobacco Company, Inc.*, 949 So.2d 1266 (La.App. 4 Cir. 6/9/03).

38.     Dr. Aberle: "Last stage cancer is found because a patient reports symptoms.  At early stage, where there are no symptoms, if we don't look for it, if we don't do a scan, we are not going to find them."

39.     "Without detection, treatment is not possible." *(Dr. Andrew von Eschenbach* – Director of the NCI, U.S. Senate Subcommittee Hearing, 2002)(Ex. 263).

### Detectable preclinical phase – the window of opportunity

40.     Dr. Aberle: "The period of time between when the cancer first begins and the time of developing symptoms and diagnosis is the detectable preclinical phase.  "Detectable," meaning it's a period of time when you can detect it, when you're still asymptomatic.  Preclinical means that you don't have symptoms.  This is the period of time within which screening occurs.  Here is your widow of opportunity."

### Mammograms = Spiral CTs (1cm = stage 1)

41.     Sprial CTs detect lung cancer at stage 1 (centimeter) disease just like mammograms detect breast cancer at stage 1 (1cm) disease.  Mammograms detect breast cancer before it can be felt and Spiral CTs detect lung cancer before symptoms.

42.     It is Dr. Aberle's, the NCI's and the tobacco defendants' position that detecting lung cancer at Stage 1A, under 1 centimeter, for the victims of the tobacco defendants' RICO conspiracy by Spiral CT screening, might harm them and even kill more of the victims than the disease itself.  They believe that doctors who recommend Spiral CTs are reckless.

### Two types of lung cancer

43.     Dr. Aberle: "Approximately 80 percent of cancers are of nonsmall cell histology.  There are two different general types of lung cancers, small cell and nonsmall cell.  The prognosis depends primarily upon tumor stage at the time of diagnosis.  Survival rates with nonsmall cell

carcinoma are dismal.  Patients with surgical Stage 1 disease may have 10-year survivals of up to 70 percent."

### The four stages of lung cancer

44.      Dr. Aberle: "There are are basically four stages of lung cancer.  The earliest, or perhaps the most curable stage, is Stage 1.  Surgically resected Stage 1A has the longest survival.  We don't know if surgically resected Stage 1 lung cancer, if picked up by a screening test will lower lung cancer death rate.  Stage 4 is the most fatal type and the most advanced stage."

### There is benefit to finding lung cancer even at late stage

45.      Dr. Aberle: "Even finding lung cancer at a late stage and treating it can produce medical benefits. The purpose of even treating a cancer at a late stage is to prolong life.  It is debatable whether it improves the quality of life.  That's an individual decision.  Spiral CT offers a potential to detect lung cancers at early stages amenable to surgical cure."

### Dr. Aberle:  "Spiral CTs are not reasonably necessary"

46.      Dr. Aberle testified that in her expert opinion based on her research, background, education and training, low-dose Spiral CT screening for lung cancer in smokers and former smokers in the State of Louisiana was not reasonably necessary according to contemporary scientific principles. Dr. Aberle's statement is fraudulent and based on *"Misused Science"* and random clinical trials (RCTs) to measure mortality benefits. RCTs do not measure quality of life benefits.

### Dr. Aberle and the NCI do not know if detecting Stage 1 (1cm) lung cancer decreases lung cancer deaths or improves quality of life

47.     It is Dr. Aberle's opinion that it is not known whether screening for lung cancer with Spiral CT will actually decrease the number of lung cancer deaths in smokers or improve their *quality of life*.

## President's Cancer Panel Meeting January 1, 1997 to December 31, 1998

### CANCER CARE ISSUES IN THE UNITED STATES
### QUALITY OF CARE: *QUALITY OF LIFE*

#### National Cancer Program - National Cancer Institute

Impact of *Quality of Life* on Quality of Care

48.     "Cancer survivors are rightfully demanding, if not cure, more durable control of their disease with fewer side effects and better *quality of life*. Simply being alive five years after diagnosis is no longer considered good enough by survivors of most cancers." (*President's Cancer Panel Meeting*, June, 2, 1998. (Ex. 181).

49.     "Definitions of *quality of life* vary. For example *quality of life* has been defined as the difference or gap between the hopes and expectations of the individual and that individual's personal experience at a particular point in time. Health-related *quality of life* refers to the individual's perceptions of emotional and physical health, including perceived effects on physical and social functioning." (*President's Cancer Panel Meeting*, June, 2, 1998, (Ex. 181).

50.     It is Dr. Aberle's, the NCI's and the tobacco defendants' opinion that the detection of stage 1 (1cm) lung cancer at a time that it can be surgically removed and treated, would do more harm than good, to the plaintiff and class members, the victims of the tobacco defendants' RICO conspiracy.

**The Medicare mammography law's guidelines**

**v.**

**NCI's mammography guidelines**

51.    The NCI, in **1989,** published and recommended that **40-49** year old women undergo **biennial** mammography screening starting at age **40**, and **annually** at age **50**. ("*Misused Science*" p. 1)(Ex. 59).

**The Medicare mammography law**

52.    On January 1, **1991**, the Medicare mammography law: 42 U.S.C. § 395m(c)(2)(A), became effective, and mandated that Medicare  pay for a baseline mammogram between the ages of **35** and **39**, every **2** years beginning at age **40**, and **annually** at age **50**.

53.    On August 5, **1997,** the Medicare Mammography law was amended to pay for **annual** mammograms starting at age **40**. The **1997** amendment also kept payment for baseline mammograms starting at age **35**.

**Federal Medicare Notice Law 42 USC § 1395b-3**

54.    The Federal "Medicare Notice law," 42 U.S.C.§ 1395b-3, mandates that the Secretary of the Department of Health and Human Services (DHHS) notify Medicare Beneficiaries and the *general public* of Medicare's benefits and the benefits of *other health insurance programs*.  The Medicare Notice law applies to NCI, CDC, FDA and DHHS.

**State mammography laws**

55.    Since **1991**, many states passed mandated mammography laws  copied from the Medicare mammography law, mandating that Medicaid, insurance companies, HMOs and other third party payors pay for mammography screening most starting with baseline mammograms at age **35**. (*U.S. Senator Kay Bailey Hutcheson*, U.S. Senate Subcommittee Hearing, 1997)(ex. 263).

**House Committee: "13,800 women could be saved with early detection"**

56.     "Mammography screening can add years to a woman's life. The American Cancer Society estimates that of the 46,000 breast cancer deaths in 1994, 13,800 women could have been saved with early detection." ("*Misused Science*" p. 2)(ex. 60).

**The NCI created the mammogram controversy**

57.     In December **1993**, the NCI created the mammography controversy and  distorted the entire body of public knowledge regarding a woman's right to have Medicare, Medicaid, her insurance company, her HMO, or other third party payor pay for mammography screening by eliminating NCI's mammography guidelines for women under **50** years of age. The NCI rescinded  its recommendation based on a *Canadian Randomized Clinical Trial (RCT)* conducted by Dr. Anthony Miller that allegedly did not show a mortality benefit for screening women under age 50 with mammography. (*U.S. Senator Kay Bailey Hutchison*, U.S., Senate Subcommittee Hearing, 1997)(ex. 263); ("*Misused Science*")(ex. 54 – 76).

58.     The NCI also said women over age **50** should have mammograms every **1 - 2** years, not **annually**. ("*Misused Science*" p. 2, footnote 2)(ex. 60).

**"Storm of controversy"**

59.     The U.S. House Committee on Government Operations in "*Misused Science*" said the NCI's elimination of its mammography guidelines created a "*storm of controversy*" in the medical, scientific and women's health communities. (*Misused Science* p. 1)(ex. 59).

**"Millions of dollars"**

60.     "After spending millions of dollars to educate women about the importance of mammography screening in the fight against breast cancer and after reaching a national

consensus on mammography screening, NCI stood virtually alone with its new proclamation." (*Misused Science* p. 1)(ex. 59).

### "No one knows who made the decision to rescind the NCI's guidelines"

61.    In December 1993, the NCI's executive committee held a meeting and voted not to recommend mammograms for women under age 50.   The House subcommittee requested transcripts of the executive committee meeting, but NCI never provided any.   The subcommittee was unable to trace by whom, where and when the actual decision was made.   One of the executive committee members wrote a memorandum to the House subcommittee and explained that, "decisions are made through discussions and formal votes are not kept." (*Misused Science* p. 11, 12)(ex. 69, 70).

### House Committee: "NCI must be accountable to the taxpayors"

62.    The subcommittee held that the NCI should maintain adequate records of the decision making process to support accountability both as an institution and by the individuals who comprise it.

63.    "It is too easy for institutions to mask the responsibility that individuals hold for the positions they advocate and decisions they make.   NCI's record keeping at a crucial stage in the guidelines debate leaves unanswered who the decision makers were, what their decisions were based on, and how strong a consensus there was behind that decision.   As an institution supported by the taxpayer, the NCI is accountable to the taxpayer and the U.S. Congress.   NCI should maintain records sufficient to allow a public recounting of its decisions and its decision-makers." (*Misused Science*, p. 17)(Ex. 75).

64. The NCI knew before it revised its mammography guidelines and began publishing mammography guidelines contrary to the Medicare Mammography law that the reasons for the low mammography screening rates were:

> a) *"Misconception that, without symptoms, there is no need to get screened;*
> b) *Lack of awareness about mammography;*
> c) *And lack of physician recommendation."*

## Most states have mandated mammography laws

65. The NCI knew before it revised its mammography guidelines and began publishing mammography guidelines contrary to the Medicare mammography law that "most states had laws mandating insurance companies and HMOs to pay for mammography screening most starting at age 35." (*U.S. Senator Kay Bailey Hutchenson*, U.S. Senate Subcommittee Hearing, 1997)(ex. 263).

## African American's have higher mortality rate

66. The NCI knew before it revised its mammography guidelines and began publishing mammography guidelines contrary to the Medicare mammography law and the mammography laws of most states, that African American women have a higher breast cancer mortality rate due to their lack of access to screening mammography. ("*Misused Science*" p. 3)(Ex. 61).

## The NCI targeted African American women after the NCI was told not to by Congress

67. The NCI targeted African American women with mammography guidelines contrary to the Medicare mammography law and the laws of most states and after the NCI was told not to, by Congress, through the U.S. House Committee in, *Misused Science*, p. 18, (Ex, 76) and (Ex. 92, 93) and in violation of 42 U.S.C. § 300u-6.

**Misused Science:  "NCI should change policy of relying solely on RCTs"**

68.      *"NCI should change its policy of relying solely on RCTs (random clinical trials) to determine screening guidelines.*

> "The subcommittee recommends that NCI review its policy of relying solely on RCTs to determine screening guidelines. *Reliance on RCTs has resulted in the exclusion of other important scientific data.*  Further, RCTs are not practical for all diseases and cancers.  For example, an American RCT to test mammography screening may not be feasible because of the enormous costs involved and the risk of contamination:  NCI would need **1.5 million women** to participate, 1,000 test centers and 10 years to track them.  Since many women in this country are aware of mammography screening, it would be difficult to have a control group of 500,000 women who could not have mammograms." (*Misused Science*, p. 16, 17)(ex. 74, 75).

**The retired Chief of the Early Detection Branch**

**at NCI told the subcommittee:**

69.      "Nearly all of the NCI's guidelines – skin, oral, colorectal, testicular, prostate were *not* based on *clinical trial evidence of decreasing mortality but on the best evidence available,* mostly indirect as is nearly the total field of epidemiology and most of medicine.  If the screening RCT is the basis of all recommendations for cancer screening then the most common procedures with the most successful treatments, such as inspection of the skin for cancer cannot be recommended." (*Misused Science*, p. 17)(ex. 75).

**Dr. Aberle:  Cancer screenings not based on random clinical trials (RCTs)**

70.      Dr. Aberle:  "Pap smear recommendations came from observational trials with historical controls.  Colonoscopy recommendations are not based on randomized controlled trials. PSA recommendations are not based on randomized controlled trials."

**Most care has not been and will not be studied by RCTs**

71.      "In cancer as in other diseases, most care has not been and will not be studied by RCTs. Frequently, variations from "standard" practice become so routine that they evolve into the standard of care.  In addition, not all aspects of care are amenable to study in an RCT. This does not mean that current approaches are the best or that they cannot be

supplemented by new scientific evidence. However, resources are limited and research is constrained by various ethical issues that preclude withholding accepted care. A continuing dilemma exists in that expert panels are asked to determine standards of care for various cancers and other conditions, *yet their experiences may not reflect existing scientific evidence*. Moreover, little evidence from high quality controlled studies may exist to support or refute the efficacy of current practice." (President's *Cancer Panel Meeting, January 1, 1997 to December 31, 1998*, p. 20)(Ex. 174).

### The NCI distorted the entire body of public knowledge again in 1997

72.     Three years after distorting the entire body of public knowledge regarding the value of mammography screening in **1994** and the importance of detecting breast cancer early, the NCI did it again in **1997**.

### "DRAFT-DRAFT-DRAFT" (ex. 77 – 91)

73.     On January 21-23, **1997**, the National Institutes of Health (NIH), a subdivision of the (DHHS), issued a *"draft report"* again calling into question the value of early detection of breast cancer by mammography using the same random clinical trial (RCT) evidence that the NCI was told not to rely on in *"Misused Science."* The NIH's draft report said:

> *"Information regarding the usefulness of screening procedures is provided by RCTs in which participants are assigned to receive or not to receive screening - in effect by a coin toss."* (ex. 78).

74.     The U.S. Senate Subcommittee on Health and Human Services investigated the publication of the draft report issued by the NIH.

75.     United States Senator Arlen Specter quoted Dr. Daniel Kopans of Harvard medical school who called the report: *"FRAUDULENT."*

U.S. Senator Arlen Specter testified:

*"We all know that if this test comes out and is accepted as not being indicated for women in their 40's, the insurance companies won't pay for it and managed care won't pay for it and then people won't have them available. I think this is an area which needs to be corrected."* (Ex. 263).

### Insurance reimbursement

76.     "Controversies about screening guidelines (e.g. mammography screening for younger women and prostate specific antigen (PSA) prostate cancer screening) have been confusing to the public and have affected reimbursement policies. In some cases, however, guidelines have been developed to help secure insurance reimbursement as much as to define the most effective care." (*President's Cancer Panel Meeting*, January 1, 1997 to December 31, 1998)(Ex. 178).

77.     After the U.S. Senate Subcommittee Hearing and after the U.S. Senate had voted 98-0 to urge the NCI to "reinstate the pre-1993 screening guidelines," the NCI on April 16, 1997 revised its mammography guidelines and recommended mammography screening every **1-2** years beginning at **40** years of age. And still contrary to the Federal Medicare mammography law and the mammography laws of most states.

### The NCI admits mortality benefits in the 2001 and 2002 Senate Subcommittee Hearings

78.     After years of questioning the value of mammography screening, and publishing and recommending guidelines contrary to the Federal Medicare mammography law and the mammography laws of most states and distorting the entire body of public knowledge regarding the value of mammography screening and the importance of detecting cancer early, the NCI finally admitted the value of mammography screening, in two U.S. Senate Subcommittee Hearings, in **2001** and **2002**. (Ex. 263).

### Mortality rates decline with screening

79.     In the **2001** hearing, Dr. Klausner, the Director of the NCI, testified that before **1991** mortality rates from breast cancer were rising. Beginning in **1991** mortality rates began to

decline. In 1991 there was a 1.6% decrease in mortality, which continued each year until 1995. In 1995, the mortality rate from breast cancer began to decline by 3.5% per year. Starting in **2001**, Dr. Klausner and the NCI expect to have **30-40%** reduction in the mortality rates of breast cancer over the next 10 years. (Ex. 263).

### Saved 38,000 lives

80.    In the 2002, U.S. Senate Subcommittee Hearing, Dr. Eschenbach, the Director of the NCI, testified:

> "In the past 10 years over all mortality rates for breast cancer continue to fall. We first saw this encouraging trend in 1989, with a decreasing death rate of 1.4% per year. More recently the decrease has sharpened to 3.2% per year. **THERE HAVE BEEN SIGNIFICANT DECLINES FOR ALL AGES.** And this reduction in death rates over time has allowed for 38,000 saved lives. We have a long way to go, particularly the gap between white and black women." (Ex. 263).

### NCI recommends mammography guidelines contrary to the
### Federal Medicare mammography law

81.    Since **1991**, for the past seventeen years, the NCI has been publishing and recommending mammography guidelines contrary to the Federal Medicare mammography law 42 USC § 1395m(C)2a, (Ex. 197), the mammography laws of most states (Ex. 233) and the NCI's mandatory duty under 42 U.S.C. § 1395b-3 to notify the general public of the Medicare mammography law *and other health insurance programs.*

### NCI, CDC, FDA and DHHS Recommend Guidelines of an
### "Independent Body," the U.S. TASK FORCE

82.     The NCI, the Center for Disease Control, U.S. Food and Drug Administration and the Department of Health and Human Services (DHHS) continue to publish and recommend mammography guidelines contrary to the Federal Medicare mammography law. (Ex. 212, 225, 228, 231)

83.     Despite the Medicare mammography and notice laws, the NCI, the Center for Disease Control (CDC), the FDA, and the DHHS currently recommend mammograms every **1-2** years beginning at age **40** – contrary to the Medicare Mammography law, and the laws of most states. The NCI, CDC, FDA and DHHS publish and recommend the guidelines of the United States Preventive Services Task Force. (U.S. TASK FORCE). (Ex. 198, 203, 212, 215, 222, 225, 227, 228, 231, 233).

84.     The U.S. TASK FORCE calls itself an independent body, despite being funded by Government through the Agency for Healthcare Research and Quality (AHRQ) (Ex. 246) an agency within the DHHS. The NCI, CDC, FDA and DHHS publish and recommend the mammogram guidelines of an *"independent-non-Government"* body that are contrary to the Medicare mammography law and the laws of most states. (Ex. 210, 216, 239, 240)

## Dr. Aberle and NCI *"Misused Science"*

## again by not recommending Spiral CTs

85.     Dr. Aberle and the NCI *"Misused Science"* again and refuse to recommend Spiral CTs to detect lung cancer at stage 1 disease (1cm).   Dr. Aberle, the NCI and the tobacco defendants created the Spiral CT controversy.   The tobacco defendants influenced the NCI through Dr. Aberle to continue the distortion of the entire body of public knowledge regarding the early detection of lung cancer by Spiral CTs, so the tobacco defendants could save money in the *Scott* Louisiana medical monitoring class action.

**Spiral CT issue is within the U.S. outside of Louisiana**

86.     Dr. Aberle, the NCI and the tobacco defendants are concerned that the premature deployment of a screening tool that has not been shown to be effective may cause harm. Dr. Aberle: "As a matter of public policy and understanding this is an issue with the United States outside of Louisiana. I think that there are economic concerns and I think that the people in the State of California need to be appropriately advised of those economic costs and that is rightfully a part of the analysis and hopefully modeling that would be done through a randomized control trial (RCT)."

**The National Cancer Institute's (NCI's)**

**mammography and Spiral CT guidelines are fraudulent**

87.     Dr. Aberle's and the NCI's refusal to recommend Spiral CTs to detect lung cancer at stage 1(1cm) is fraudulent for the same reason that the NCI's refusal to recommend mammograms for women under age 50 to detect breast cancer at stage 1(1cm) was fraudulent. ("*Misused Science," Draft-Draft-Draft*) The NCI used the same arguments not to recommend mammograms for women under age 50, as Dr. Aberle, and the NCI use not to recommend Spiral CTs for plaintiffs, the victims of tobacco defendants' RICO conspiracy.

**The same arguments against mammograms and Spiral CTs**

88.     The NCI used the necessity of RCTs to measure mortality benefits not to recommend mammograms to women under age 50. Dr. Aberle and the NCI use RCTs to measure mortality benefits not to recommend  Spiral CTs to high risk smokers.  They also argued: Anxiety from false positives. False-negatives. Unnecessary procedures, including surgery. The risk of radiation. Overdiagnosis bias. Detection of cancer that is not harmful. Lead-time bias. Length time bias. Tumor biology and the variable growth rate of cancer. Cancer grows at different rates

in different people. Surprise cancers – cancers that are discovered after death caused by something other than lung cancer. Some cancer is aggressive and some is not. Prolonged survival. Potentially adverse side affects. Questions of cost and benefit. The benefits don't outweigh the risks.

### NCI: "Treating early stage lung cancer is more costly"

89.     It was the NCI's position on September 23, 1999, that information from Medicare and HMO payments for local, regional, and distant disease, showed that treating early-stage disease is more costly than late stage, invalidating the assumption that lung cancer screening would be cost-saving because treating early-stage is less costly.  Dr. Barnett Kramer Director of NCI: "This is because lead time bias also occurs in disease-related expenditures." (Ex. 49).

### 1989 Federal Judge rejects "lead time bias theory

90.     Ten years before Dr. Kramer' statement, Federal Judge Saffels in *Borgren v. United States*, 716 F.Supp. 1378, 1381 (D. Kan. June 30, 1989) rejected the U.S. Government's "lead time bias" defense.

### Fraud on the taxpayors and the victims of the tobacco defendants' RICO conspiracy

91.     For the NCI to spend $225 million dollars (Ex. 8) of taxpayor money to measure mortality benefits of Spiral CTs that detect stage 1(1cm) disease and after the NCI was told that they should change their policy of relying on RCTs to measure mortality benefits to determine cancer screening guidelines, is a fraud on the taxpayors, the plaintiff and class members, the victims of the tobacco defendants' RICO conspiracy. (*Misused Science*)(Ex. 54 - 76).

### Dr. Aberle:  "There is not enough data"

92.     Dr. Aberle, the NCI and the tobacco defendants claim that there is not enough data that people live longer, when lung cancer is discovered at stage 1 (1cm).  So, the tax payors are

spending $225 million dollars to measure whether people live longer, if there cancer is discovered at stage 1 (1 cm) disease. This is exactly what the NCI said about mammograms for women under age 50 in December 1993, when the NCI created the mammogram controversy.

93.     The NCI is performing an RCT to measure who dies first, the people who receive Spiral CT or the people who receive chest x-ray. If the people with Spiral CT live longer, then they had interventions and treatment that the persons with chest x-rays did not receive, because chest x-rays are not as effective as Spiral CT in detecting lung cancer at stage 1 (1cm).

### Reducing the mortality rate depends on the interventions

94.     Dr. Aberle: "A screening CT in and of itself has no merit. It is the observation and the way the observations are acted upon subsequently that may or may not have benefit for individuals."

95.     Dr. Aberle: "Contemporary computed tomography, CT, offers the potential to detect lung cancers at early stages amenable to surgical cure. Performing a CT or a chest x-ray or any test and finding a cancer, whether it be lung cancer or otherwise, produces no particular benefit other than you know it's there. Reducing the death rate depends on the intervention. There are different kinds of treatments. Treatments at a late stage are limited to basically radiation and chemotherapy in an attempt to prolong life and attempt to make life more bearable.

96.     It is Dr. Aberle's opinion that screening for disease is not to discover the disease at the earliest possible time in the context of medical technology, it is to identify the disease and allow intervention to prevent mortality.

### The standard of care

97.     The United States Government's recommendation of lung cancer screening by the NCI is the public policy and the medical standard of care. Doctors must order the standard of care.

98.    Third party payors, like Aetna, must pay for the standard of care.

99.    Third party payors, like Aetna, use the National Cancer Institute's (NCI's) lung cancer screening guidelines *not* to pay for Spiral CTs.  (Ex. 16).

100.    Plaintiff's insurance company, Aetna, relies on the NCI's cancer screening guidelines as public policy and the standard of care *not* to pay for plaintiff's Spiral CT screening.  Plaintiff's insurance company, Aetna, will not pay for plaintiff's Spiral CT because Dr. Aberle and the NCI do not recommend them.  (Ex. 16).

101.    Dr. Aberle: "With helical CT we see many, many more nodules than we will see with chest x-ray.  However, we know that the majority, over 90 percent, will be benign.  We will see more cancers with CT and the cancers will be smaller in size.  And we will see more early-stage cancers."

102.    Dr. Aberle, the NCI and defendants all admit that Spiral CT does what it is designed to do.  Spiral CT detects lung cancer at stage 1 disease (1cm).  That's what it does.  And it does very well.  There is no dispute that Spiral CT detects lung cancer at stage 1 (1cm).

### Dr. Aberle:  "Considerable uncertainty"

103.    Dr. Aberle:  "There is considerable uncertainty about the use of low-dose helical CT scans. We do not know if the scan is beneficial.  We do know what the harms are, and we certainly do not know if any perceived benefits would outweigh the harms. And before the National Cancer Institute (NCI) can recommend that screening test to the American public, we need to know those answers."

### Dr. Aberle:  "Spiral CTs are experimental"

104.    Spiral CT scans to screen for lung cancer are considered to be experimental and investigational by Dr. Aberle, the NCI, tobacco defendants, and third party payors, like Aetna.

- 29 -

(Ex. 16 – 28).

## No Standard of Care

105.   It is Dr. Abele's opinion that there is no standard of care that recommends Spiral CT for lung-cancer screening as public policy. Dr. Aberle knew that she was making public decisions about Spiral CT that determined the standard of care for the tobacco defendants and third party payors to pay for Spiral CT screening.

## Dr. Aberle: "The risks are trivial"

106.   Dr. Aberle: "It is very unlikely that anyone would sustain serious injury from a low-dose helical CT.  The risks from a Spiral CT are very trivial."

## The NCI:  "_Not_ having a Spiral CT can be more risky than having it"

107.   The NCI:  "Some people may be concerned about the amount of radiation they receive during a CT scan.  It is true that radiation exposure for a CT scan can be higher than from a regular x-ray.  However, _not_ having the procedure can be more risky than having it, especially if cancer is suspected.  People considering CT must weigh the risks and benefit." (Ex. 108).

## Dr. Aberle: "Spiral CT is unproven"

108.   It is Dr. Aberle's opinion that Spiral CT has not been proven to be an effective screening tool because there is no evidence proving whether a person will die from lung cancer or not. A person may just live longer with the diagnosis. Dr. Aberle:  "If lung cancer is detected and the person does have surgery, it may not be curative and that person may still die from lung cancer. Lung cancer screening is unproven."

109.   Dr. Aberle believes that the costs of screening needs to be weighed very carefully against the benefits of screening and against the deleterious effects that may occur as a consequence of screening.

## Public Policy

110.   It is Dr. Aberle's opinion that as a matter of public policy, we should be careful that we don't divert funds for lung-cancer screening that might be better used for curing lung cancer.

111.   It is Dr. Aberle's opinion that Spiral CT screening is a decision of the public and the greater community and she is one small drop in that formula for decision.

### Dr. Aberle: "Spiral CT must reduce mortality before we can recommend"

112.   Dr. Aberle would recommend Spiral CT, if she was convinced that it would reduce lung-cancer mortality. The public must decide how much reduction in mortality is enough. Dr. Aberle does not know how much reduction in mortality is necessary for her to be convinced that Spiral CT is an efficacious test for lung cancer.

113.   It is Dr. Aberle's opinion that Spiral CT has been effective in identifying more early-stage 1A tumors than any other modality.

### Dr. Aberle:  Lung cancer is a lethal disease"

114.   Dr. Abele believes that lung cancer is a lethal disease, almost anyone who gets it and does not do anything about it, dies. Dr. Aberle agrees that the scientific studies suggest that it is a good thing to locate Stage 1A lung cancers as opposed to more advanced-stage lung cancers.

### Treatment Options

115.   Data on mortality from the ACRIN (American College of Radiology's Imaging Network) study will be affected by the efficacy of the types of treatment options that are used.  With early-stage lung cancer, the optimal treatment is lobectomy. The current approach to early-stage lung cancer is surgery.

116.   Dr. Aberle: "The earlier stage we find it, the greater number of options. The earlier stage that we find the tumor the greater opportunity we have that by surgery and removal of the tumor, we can actually save the life and cure the person."

117.   Dr. Aberle: "Stage 1A lung cancers are the cancers that I would want to identify because they offer the greatest potential for surgical cure and are certainly associated with longer survival. Unfortunately, I do not know whether that will actually save lives, *but I do know that more advanced-stage disease is more likely to be lethal to the patient.*"

### Dr. Aberle: "Insufficient data"

118.   It is Dr. Aberle's, the NCI's and defendants' opinion that there is insufficient data, because the studies "simply have not been done to conclude that early detection of Stage 1A tumors will ultimately result in people with Stage 1A tumors not dying of lung cancer."

### Dr. Aberle: "Patients best interest to know stage of disease"

119.   It is Dr. Aberle's opinion that it is in the patient's best interest to know their stage of disease. "It allows for a better determination and prognosis and may influence therapy."

### Dr. Aberle: "The option of surgical removal"

120.   Dr. Aberle: "The idea and the great hope is that we can find early stage lung cancers, because we know that if we find it at an early enough stage, instead of doing chemotherapy and radiology, we have the option of surgical removal or resection of the tumor."

### Dr. Aberle: "The goal of screening"

121.   Dr. Aberle: "The goal of screening is to find a cancer at its earliest possible stage and remove it and the cancer is gone. It hasn't spread anywhere hypothetically. It hasn't gone to the lymph nodes. It's an isolated early stage lung cancer. *The patient has been cured. That's what doctors are looking for.*"

## JOINT AND SEVERAL LIABILITY

122.    Each tobacco defendant is jointly and severally liable to each plaintiff at risk for lung cancer regardless of the cigarette brands the plaintiff smoked.  Because the tobacco defendants conducted the affairs of the National Cancer Institute (NCI)  through a pattern of racketeering and distorted the entire body of public knowledge about Spiral CTs and the importance of detecting lung cancer at stage  1 disease (1 cm), the tobacco defendants are jointly and severally liable to every person in Georgia at high risk from lung cancer due to smoking cigarettes from June 2000, the date the Tobacco enterprise hired Dr. Aberle.

123.        "Where the fraudulent scheme is targeted broadly at a large portion of the American public, the requisite showing of reliance is less demanding. Such sophisticated, broad-based fraudulent schemes by their very nature are likely to distort the entire body of public knowledge rather than to individually mislead millions of people... To require reliance on specific misrepresentations where indirect challenges on communications were integral to the success of the scheme would produce the perverse result of having the most massive and sinister fraudulent schemes be the ones that must escape ... liability."   Individual reliance is not necessary to prove damages when a defendant distorts the entire body of public knowledge. *See Falice v. American Tobacco Co.* 94. F.Supp.2d 316, RICO Bus.Disp. Guide 9882, E.D.N.Y. 2000, Judge Weinstein.

### Dr. Aberle:  "Stage 1A is the best you can have"

124.    "There have been studies in the surgical literature that have looked at patients who have early stage lung cancers, and that is a Stage 1A.  That's the best you can have. That's the earliest stage of cancer that you have."

125.    Detecting Stage 1 (1cm) cancer is the easiest and most cost effective to treat, provides the most benefits to the patients, is the greatest reduction in the patient's suffering, improves the patient's chances at living longer, leads to greater quality of life "and is less mutilating." (*Dr. Andrew von Eschenbach*, Director of NCI, 2002)(Ex. 263).

### NIH and NCI grants to Dr. Aberle

126.    Dr. Aberle has worked with the National Cancer Institute (NCI) in a couple of different ways.  She has worked as a member of the review sections that the NCI has when scientists submit grant proposals to the National Institutes of Health (NIH) for funding. The NCI gathers together many different scientists from different fields to review those grants and decide whether they are a good idea and whether or not they should be funded.  And Dr. Aberle is on the review committees for those grants and has done that for a few years.

127.    Dr. Aberle has worked with the NIH either as a presenter or chair at workshops.  At a workshop the NIH focuses on an idea or area of interest that may be controversial. The NCI gathers together scientists from different disciplines to look at the idea and to hash out whether or not the NIH should spend more time or invest money in the idea.

128.    Most of the NCI workshops that Dr. Aberle has participated in have dealt with lung cancer screening. Dr. Aberle:   "The NCI has held workshops and symposia to try to get investigators representing a variety of different disciplines and perspectives together at the same time to formulate consensus on how we should evaluate CT for lung-cancer screening."

129.    Dr. Aberle, besides being on the grant committee for the NCI, also does medical research herself. In her capacity as the chief of chest radiology at UCLA, she has organized the thoracic research group that has about 30 members: four doctors, a couple of physicians and a couple of basic scientists, "and about 25 staff people that do different research, most of it on lung cancer."

130.    Dr. Aberle is also the vice chairman of research at the UCLA department of radiology. She identifies and develops resources for all of UCLA's scientists. She helps scientists identify funding sources within the NCI.

131.    Dr. Aberle has received research grants from the NCI to perform medical and scientific research. Dr. Aberle's principal area of research is in lung cancer and Spiral CT.  Dr. Aberle is trying to determine whether lung cancer screening with Spiral CT will reduce lung cancer death rates.   She is developing image processing methods with computers so techniques can be developed to distinguish spots that "we may find on the lung with either chest x-ray or Spiral CT, to see if we could determine whether they are benign or malignant."

132.    Dr. Aberle brought a chart to Louisiana, so the jury could see her current research projects. Virtually all of Dr. Aberle's research projects are funded by, at least in part, the National Institute of Health (NIH) and the NCI.  Dr. Aberle has had other NCI research grants in which the research has already been completed.

133.    Dr. Aberle is the principal investigator of one of five projects with a lung cancer SCORE grant that was submitted to the NCI at the same time that she submitted the first grant, the RO1.

### No publications yet

134.    Dr. Aberle has published 85 or 90 articles in peer-reviewed journals. Dr. Aberle has not published any original research regarding CT screening for lung cancer because her largest and most time consuming project, the NCI lung cancer random clinical trial (NLST) is only halfway through enrollment. (2003). Dr. Aberle:  "So we are only actually beginning to collect the data for it, and there is no analysis of results to be published. We have to wait for the project to be completed or near completion before we can publish."

135.    Dr. Aberle's curriculum vitae presented at the *Scott* Louisiana jury trial on June 18, 2003, showed that Dr. Aberle spends 50% of her time on the NCI's lung cancer random clinical trial (NLST). The total grant for the NLST is $200 million dollars. The amount received by UCLA and other participating sites depends on the number of enrollees UCLA has in the NLST. Because Dr. Aberle is a  UCLA faculty member and teacher, UCLA will not allow her to have 100% of her salary supported by research grants. Dr. Aberle spends 90% of her time on research supported by grants.

### Dr. Aberle's protocol

136.    At the time of her deposition, Dr. Aberle had a protocol "and the inherent intellectual property associated with the protocol was submitted to the NCI for consideration."

137.    The NCI is the primary sponsor of the NLST. The other sponsors are ACRIN and the American Cancer Society. ACRIN, which is a cooperative group, is also funded by the NCI.

138.    Dr. Aberle is the national principal investigator for the ACRIN grant.

### Dr. Aberle is a Government Official

139.    Dr. Aberle has received numerous grants from the NCI and has had contact throughout her career with the individuals in the NCI, and is thus, a government official, agent, or employee.

### RICO ALLEGATIONS

### 18 U.S.C. § 1962 (c)

140.    The tobacco defendants' unlawful conduct is in violation of 18 U.S.C. § 1962(c).  the tobacco defendants associated-in-fact as the tobacco enterprise and participated in the conduct of the affairs of a separate enterprise, the National Cancer Institute (NCI), through a pattern of racketeering activity. The tobacco defendants used the wires to communicate with and hire Dr. Aberle, a Government Official and a co-director of the NCI's lung cancer random clinical trial

(NLST), to testify for defendants in *Scott*, Louisiana's medical monitoring class action, that Spiral CTs detect lung cancer at stage 1 disease (1cm), but are not reasonably necessary according to contemporary scientific principles. Dr. Aberle's opinion and her testimony are based on "*Misused Science*," and are fraudulent. The tobacco defendants, through Dr. Aberle, influenced the NCI's decision not to recommend Spiral CTs to detect lung cancer at Stage 1 disease (1cm) as a matter of public policy for the victims of tobacco defendants' RICO conspiracy.

### 18 U.S.C. § 1962(d)

141.    The tobacco defendants violated 18 U.S.C. § 1962 (d) by conspiring together as an enterprise to violate 18 U.S.C. 1962(c) and participated as an enterprise in the conduct of the affairs of a separate enterprise, the National Cancer Institute (NCI), through a pattern of racketeering activity.  Dr. Aberle testified that she met with four tobacco lawyers. She did not know which tobacco defendant hired her.  All the tobacco defendants benefited from Dr. Aberle's testimony.  At trial, on direct examination, Dr. Aberle was asked:  "What did we ask you to do in terms of rendering an opinion in this case." Dr. Aberle's answer: "You asked me to review the medical monitoring plan for low-dose screening CT and to render an opinion. I did so."

142.    Curtis L. Perry, a lawyer representing Philip Morris, Inc. and Lorillard Tobacco Company, called Dr. Aberle on the telephone in June 2000. Dr. Aberle believes that she agreed to provide testimony about the appropriateness of screening in the first telephone call. All correspondence from tobacco defendants to Dr. Aberle before she submitted her expert report, was by telephone and e-mail. Dr. Aberle testified at trial in Louisiana on June 8, 2003, that she was hired by the cigarette companies sometime in 2000. Dr. Aberle testified that she did not

know which cigarette companies she was working for. "I am interacting with attorneys, and those attorneys are representing tobacco companies. I don't know what tobacco companies."

143.    Dr. Aberle met with as many as four lawyers in Los Angeles after submitting her expert report. The first time Dr. Aberle met with Mr. Perry was July or August 2000 in Los Angeles. Dr. Aberle was doing work under grants from the NIH and NCI at the time she was contacted by the defendants' lawyers. At the time of the deposition, November 11, 2000, Dr. Aberle's research was just being finalized; she was developing the procedure manuals for the NLST. Dr. Aberle had been in regular contact with representatives from NCI regarding the progress of the trial (NLST) and had continued to meet with investigators across the country who would be participating in the trial (NLST).

### WIRE FRAUD

144.    The tobacco defendants' conduct violated the wire fraud Statute:  18 U.S.C. § 1343.  In June of 2000, lawyers for the tobacco defendants called Dr. Aberle in California on the telephone and hired her to testify for the tobacco defendants in Louisiana in furtherance of their scheme not to pay for Spiral CT screening for the victims of the tobacco defendants' RICO conspiracy. Communications between Dr. Aberle and the tobacco defendants was done by e-mail and facsimile.  Dr. Aberle gave a telephone deposition from California to lawyers in Louisiana on November 10, 2000. Dr. Aberle came from California to testify at trial on June 18 and 19, 2003 in Louisiana. Communications were made by the tobacco defendants in Louisiana to Dr. Aberle who was in California through the wires in furtherance of the tobacco defendants' scheme to deny Spiral CT screening to the victims of the tobacco defendants' RICO conspiracy.

## MAIL FRAUD

145.   The tobacco defendants provided Dr. Aberle with depositions and statements regarding the proposed screening program.   Upon information and belief the tobacco defendants' sent depositions and statements and other correspondence to Dr. Aberle through the U.S. Mail in violation of the mail fraud statute, 18 U.S.C. § 1341.

## BRIBERY OF A PUBLIC OFFICIAL

146.   The tobacco defendants, in pursuit of financial gain, engaged in conduct that violated Title 18  U.S.C.§ 201(b)(A) to influence the actions of Dr. Aberle, a public officer; section 201(b)(C) to induce, Dr. Aberle to do, or omit to do, an act in violation of her lawful duty as a public official; and section 201(3), by paying a witness fee to Dr. Aberle with the intent to influence her testimony under oath as a witness in the *Scott* Louisiana medical monitoring class action.

## DEPRIVATION OF HONEST SERVICES

147.   The tobacco defendants engaged in a scheme to deprive plaintiff of the intangible right to Dr. Aberle's honest services, a violation of 18 U.S.C. § 1346, by paying her a witness fee to testify for the tobacco defendants in the *Scott* Louisiana medical monitoring class action and against plaintiff and class members, the victims of the tobacco defendants' RICO conspiracy.

### Dr. Aberle's and the NCI's Mandatory Duty

148.   Dr. Aberle occupied a position of public trust with official responsibilities.  Dr. Aberle as a public official, owed a fiduciary duty to the public to make governmental decisions in the public's best interest.  Dr. Aberle's misuse of her office for private gain constitutes fraud.

149.    The tobacco defendants have interfered with the plaintiff's right to receive truthful information from the NCI.  The tobacco defendants have manipulated the NCI under the Federal Bribery Statute.

150.    Dr. Aberle as a government official in charge of the lung cancer random clinical trial (NLST), had a mandatory duty to follow Congress, through the U.S. House Committee's mandate in *"Misused Science"* that the NCI not rely solely on random clinical trial evidence of mortality benefits to determine cancer screening guidelines. (*Misused Science*, p. 16, 17)(ex. 74, 75).

### Dr. Denise Aberle's testimony

151.    Dr. Aberle testified that she is not a friend of the tobacco companies.  Dr. Aberle went to New Orleans to testify because she thinks that it is important that the Louisiana jury know what is and what is not known about lung cancer screening.

152.    Dr. Aberle is familiar with the position of government agencies such as the NCI and major medical organizations regarding lung cancer screening.

153.    Dr. Aberle agrees that cigarette smoking is addictive and causes lung cancer.

154.    Dr. Aberle agrees that Spiral CT technology is scientifically appropriate for the detection of nodules in the lungs. It is Dr. Aberle's opinion that Spiral CT is accurate and highly sensitive and is the most sensitive imaging tool available for the detection of nodules for any histology in the lung.

### Spiral CT – most effective methodology

155.    Dr. Aberle: "Spiral CT is the single most effective methodology for finding small Stage 1A lung tumors."

## The Spiral CT debate

156.  Dr. Aberle knew that the debate over lung cancer screening had been going on for two years before her deposition on November 11, 2000.

## History of Spiral CT

157.  Doctors in Japan and the United States have been using and studying low-dose Spiral CT for screening since 1993. The first reported case of significance are studies that began in 1993 by Dr. Kaneko in Japan.

158.  The emergence of low-dose Spiral CT as a major issue started in 1998 with the First International Conference on Early Detection of Lung Cancer in Verase, Italy. Dr.Aberle: "And as a result of the meeting came recommendations for the examination of low-dose CT for the early detection of lung cancer."

## Dr. Claudia Henschke

159.  In 1999, another extremely significant event that motivated attention to low-dose Spiral CT was Dr. Henschke's results in the ELCAP study published in the medical journal, *Lancet*. Dr. Henschke and her group ELCAP began trials at Cornell Medical Center in New York around 1993.

160.  Dr. Aberle: "The initial exploration of low-dose helical CT began with the Japanese trial and the initial publicity and public relations, certainly in the lay press, began with Dr. Henschke's group in 1999."

161.  Reports have been published of the studies done by Dr. Henschke, the Japanese and the Mayo Clinic's single-arm study.

162.  Dr. Aberle is familiar with the studies Dr. Henschke did at Cornell in New York. Dr. Henschke has published two articles about her Spiral CT study. Dr. Aberle: "Dr. Henschke's

- 41 -

CT trial is no longer funded by the NCI. The NCI did fund her study, but Dr. Henschke was not funded again."

163.    Before 1999, Dr. Aberle had little involvement in research or clinical studies in the use of low-dose Spiral CT for the early detection of lung cancer and before 1999, Dr. Aberle had never published an article on Spiral CT for lung cancer screening.

### Liggett and Dr. Henschke

164.    Liggett, a Tobacco company, financed some of Dr. Henschke's Spiral CT research. Liggett was not a defendant in Louisiana and thus is not a defendant in this class action. The defendants in Louisiana did not call Dr. Henschke as a witness, because she recommends mass screening for lung cancer with Spiral CT. It was Henschke's publication in *Lancet* that the NCI discussed at the NCI's Spiral CT meetings on April 29, 1999, and September 23, 24, 1999. Dr. Anthony Miller summarized the items from the April 29, 1999, NCI Spiral CT meeting:

165.    "Spiral CT appears to provide advances in sensitivity and in the early detection of lung cancer. At present uncertainty exists about is specificity, which may be no better or worse than chest radiography. The technology seems to advance the time of diagnosis however there are no estimates of the long-term impact on survival. The issues of biomarkers is still a question... Evaluation of the treatment of early Stage 1 disease that may be detected by Spiral CT would be needed to begin to determine appropriate screening guidelines... Lung Cancer is a disease with a high mortality rate. Therefore evaluation of new technologies that may detect it an earlier, more curable stage is essential... The group was very enthusiastic about the concept of Spiral CT. NCI will explore further study of this potentially promising technology." (NCI's Preliminary Meeting to Discuss Trial Issues April 29, 1999)

166.   It was Dr. Anthony Miller's research that started the mammography debate with his Canadian study. The NCI used Dr. Miller's random clinical trial research not to recommend mammograms to women under age 50.   Dr. Miller's *Canadian* study was the only mammography study that Dr. Aberle was aware of about mammograms and breast cancer.

### Dr. Aberle's position on mammograms

167.   It is Dr. Aberle's opinion that mass supportive mammography is debatable. Dr. Aberle: "I'm sure you're aware of the recent *Canadian Trial* which also calls into question the utility of mammography. I am not aware of any randomized control trial that has shown an unequivocal mortality benefit from a screening procedure." Dr. Aberle is not an expert in breast cancer and mammograms. She is not aware of any randomized control trials for mammograms and has not reviewed the literature.  Dr. Aberle has no idea what percentage of baseline mammograms are found positive for some type of nodule; she does not work with mammograms at all.

168.   Dr. Aberle is not aware what the recommendations for mammography for breast cancer currently in effect are.  "You know, I don't know exactly what the recommendations are.  I think it's at least 40 and it may be 50.  And I let my personal internist actually tell me when I have to go in."

### The mammography controversy

169.   Dr. Aberle does not specialize in mammograms and screening for breast cancer. Dr. Aberle is aware as a medical doctor that there has been a significant controversy over the years as to whether recommendations should be made for screening women either between 40 and 50. Dr. Aberle:  "There has been a significant amount of controversy and it's  been written about heavily in the literature.  There have been randomized control trials (RCTs) that have gone both ways.  Some very prestigious organizations have concluded that randomized controlled trials

(RCTs) regarding mammograms for women between the age of 40 and 50 have no proof of improvement in mortality rates."

### Spiral CT's additional capabilities

170.    Mult-channel Spiral CT, since 1998, has offered additional capabilities. Dr. Aberle: "We are able to acquire image data with a computer with tons of data elements.  We can tell the computer to reconstruct it, so that it conforms to a certain CT protocol.  We can save the raw data and reconstruct it differently so that the image quality, the level of special resolution, and the signal to noise within those images, all of these features that affect *interpretation* and *detection tasks*, can be modified."

171.    Dr. Aberle: "My goal is to acquire and save the data, so five years later, if I want to look at a person's lungs with higher special detail, I have the original data and can tell the computer to spit out a different set of images."

### Dr. Aberle:  "A screening test should throw a wide net"

172.    Dr. Aberle: "A screening test is intended to systematically test asymptomatic individuals for preclinical disease for the disease process before it becomes sufficiently advanced to produce signs and symptoms.  A good screening test is not a specific test because that implies that it will be a relatively insensitive test.  You want it to throw a wide net out to be able to capture all possible cancers.  So by definition, a screening test is usually – relatively - nonspecific, so that it may be highly sensitive."

173.    Dr. Aberle's goal is to find a safe, accurate, and effective method to detect lung cancer early enough to intervene and prevent deaths from lung cancer. Dr. Aberle is in favor of medical screening, if it's effective. Dr. Aberle believes that a screening test should not be performed, if the risks are not known.

- 44 -

### The NCI's Lung Cancer Random Clinical Trial (RCT)

### AKA: The National Lung Cancer Screening Trial (NLST)

174. The NLST is a randomized controlled trial. There are two arms to the trial, the experimental arm and the control arm. Eligible persons are at high risk for lung cancer. High risk for lung cancer is determined by age and intensity of smoking. Persons with symptoms of lung cancer are excluded from the NLST. The NLST was started in September 2002.

### 2 groups: ACRIN and PLCO

175. The NLST is made up of these two groups, the ACRIN and PLCO that have harmonized their protocols. Together, 50,000 individuals are enrolled.

176. Every person signs a consent form to participate in the trial and is made to understand the design of the trial. Each participant is randomized by a computer.

### 3 years = 3 Spiral CTs or 3 x-rays

177. The persons in the experimental arm will undergo 3 Spiral CTs, 1 per year for 3 years. Persons in the control will have 3 chest x-rays, 1 per year for 3 years. No one will, unless they do so outside of the trial, have a CT if they were in the chest x-ray arm or receive a chest x-ray, if they were in the CT arm.

### Experimental group v. the control group

178. In RCTs, whether studying a drug, a medical device, or diagnostic device, there is an experimental group who get the drug, the device or the diagnostic test, and the control group, who do not receive the test. The control group is compared to the experimental group.

### Ethical considerations and consent

179. There are certain ethical considerations in performing an RCT. Participants must sign consent forms that explain the test to them and their obligations. The NCI and the persons

performing the RCT, cannot ethically withhold standard medical care, treatment, or any medical procedures from any participant in that clinical trial. If CT screening for lung cancer was the standard medical care for smokers and former smokers, the NCI and the persons performing the test could not withhold CTs from the control group.

### Radiation is not from Spiral CT

180.    The participants are told that the radiation exposure is not from the Spiral CT, but from any additional diagnostic tests that they are likely to require, if they have a positive screening test.

181.    After the participants have had screening, they will be followed up to the year 2009. The 50,000 members of NLST and ACRIN will be followed for eight years. During that time, the combined trial will look at end points. The lung cancer specific mortality is the most important measurement and is the difference in death rates between chest x-rays and Spiral CTs.

### The stages

182.    The second important measurement is the stage of the lung cancer. Dr. Aberle: "How advanced are the cancers? How sensitive are they? And how specific are they in actually being able to pick up not nodules, but lung cancers?"

### If cancer is detected...

183.    If a patient does have a nodule discovered, the final decision as to what step to take next concerning diagnosis or treatment is ultimately up to the patient and the patient's healthcare provider.

### Best chance

184. It is Dr. Aberle's opinion that the best chance for people living longer is if the diagnosis is made with early-stage cancer and you have surgery. Dr. Aberle: "And that has raised the interest in trying to identify a screening test that would help us find lung cancer early.

### Dr. Aberle: "Dr. Henschke's data is very important data"

185. It is necessary for the NCI to spend $200 million dollars, because in Dr. Aberle's opinion, it's important to understand that Dr. Henschke's trial and Dr. Swenson's trial and there's also a third trial being done at the Moffat Cancer Center that's associated with the University of South Florida, are all *one-arm trials*. In an *one-arm trial*, all of the participants receive the same treatment and some important measurements are made. Dr. Aberle: "Some very important data has come out of those trials, but the fundamental deficiency of a *one-arm trial* is the fact that, ultimately, you can't tell if the screening test gives you benefit in lowering lung cancer deaths. You can't ultimately tell if the screening test has a benefit and what the risks are and what the risk/benefit ratio is because you don't have anything against which to compare it. That is why we do randomized controlled trials and have a comparison arm."

### No Control Arm in one-arm trial

186. It is Dr. Aberle's opinion that the lack of a control arm in Dr. Henschke's study, contributes to the failure to tell whether CT scans are going to reduce the number of deaths. Dr. Aberle believes her study with a control arm will ultimately be able to answer whether CT screening for lung cancer in smokers and former smokers reduces deaths from lung cancer. Dr. Aberle: "Dr. Henschke does not have any long-term data on survival rates from cancer in the participants in her study."

### Reckless

187.   Dr. Aberle: "It is true that a lot of people are going to die from lung cancer whether this trial goes four years or whether it goes to the year 2009. If we begin to use CT screening now, there's going to be hundreds of thousands of people who die from lung cancer and conceivably many more because of the potential risks of the tool in disseminating it without knowing what the harms are. The Hippocratic Oath says first do no harm, and it is for that reason that it is reckless or irresponsible to promote, as a general practice, Spiral CT screening today with our current state of knowledge."

### Dr. Aberle: "Spiral CT is untested"

188.   It is Dr. Aberle's opinion that Spiral CT is an untested screening test that is very sensitive. It will identify lots of small nodules. It will convert lots of ostensibly healthy individuals into patients. It has the potential to cause harm to those individuals by subjecting them to diagnostic workups, unnecessary surgeries and potential treatments. Dr. Aberle: "And we don't even know whether it is effective in doing what we want it to do, which is to reduce death rates."

### Dr. Aberle: "We must have RCT"

189.   It is Dr. Ablerle's and the NCI's position regarding Spiral CT that "although there is public and political pressure, based only on low-dose CT prevalence-screening data to change clinical practice rapidly and to offer mass lung cancer screening, there should be no compromise or shortcuts in the rigorous scientific process required and until appropriate studies  are completed. Dr. Aberle:  "We strongly recommend that well-designed studies be conducted, completed, analyzed, and validated before a mass screening program is implemented.  Until

these trials clearly confirm a reduction in mortality from lung cancer, only carefully monitored studies should enroll patients for lung-cancer screening."

### Dr. Aberle: "Size is just one factor"

190.    It is Dr. Aberle's opinion that there's no doubt, that CT scans can pick up smaller spots or nodules in the lungs than a chest x-ray. Dr. Aberle: "The size of a tumor does have some influence over the stage of a tumor, but it doesn't determine the stage of a tumor entirely. It's one factor that contributes to the stage."

### Good actor or bad actor?

191.    Dr. Aberle: "The size of tumors is not an adequate way to tell whether or not this tumor is going to be a good actor or a bad actor. It's not a good way of telling whether or not you have a tumor that is going to be an aggressive tumor or if it's going to be a slow-growing tumor."

192.    Dr. Aberle and the NCI know that Dr. Henschke's study and the Mayo study show that Spiral CT can find smaller spots in the lung. It is Dr. Aberle's and the NCI's position that finding smaller cancer does not prove it reduces deaths from lung cancer. Dr. Aberle: "The size of a lung cancer does not predict its behavior and does not tell you its stage. The size doesn't tell you whether you're going to die from it or not. That's a common misperception."

### Dr. Aberle: "Smaller is not earlier"

193.    Dr. Aberle: "We can not tell the stage from the size of the lesion. In CT screens in three different patients, the initial tumor turned up about the same place, about the same size, three different stages on diagnosis." It is Dr. Aberle's opinion that smaller cancers are not earlier cancer.

### A 12 millimeter cancer can be 3 different stages

194.    Dr. Aberle: "A 12 millimeter spot is a T1 Cancer. There were no positive regional lymph nodes or metastases, so this patient is at the best stage, Stage 1A lung cancer. No lymph glands."

195.    Dr. Aberle: "A second 12 millimeter lesion with positive regional lymph nodes. The same size and location, but more advanced lung cancer." This is a Stage 2A cancer. *It has different implications and different procedures will be done on the patient.*"

196.    Dr. Aberle: "The final patient is a 54-year-old smoker and, again, right side of the chest, an 11 millimeter lesion contacting the chest wall. It's a T1 lesion. In this case, the additional workup identified a bunch of regional lymph nodes within the lung in these two areas. At the center of the chest there were enlarged lymph glands. That automatically advances this patient's stage to a 3A lung cancer. *This patient has a very different prognosis and will receive different treatment.*"

### Dr. Aberle: "Unclear whether there was a shift in stage"

197.    It is Dr. Aberle's position that it is unclear whether the earlier-stage disease detected represents a true stage shift and whether detection at an earlier stage improves mortality rates. Screening studies have raised issues regarding false-positive findings, overdiagnosis, quality of life, and unnecessary surgical procedure expense, morbidity, and mortality.

### Dr. Aberle: "Risks could outweigh benefits"

198.    Dr. Aberle: "Spiral CT has not been proved to meet the criteria for an effective screening test. False-positive findings raise serious issues regarding quality of life and radiation exposure. Surgery for false-positive findings could lead to more morbidity and mortality among subjects who underwent screening than could be saved with any reduction in disease-specific mortality. The risks of mass screening could outweigh the benefits."

### Dr. Aberle: "The stakes are high"

199.    Dr. Aberle thinks that doctors should tell patients in explicit terms that CT screening for lung cancer has no proven benefits and that serious risks could outweigh benefits (if there are any.) Dr. Aberle: "Patients should understand that the stakes are high."

### Dr. Aberle: "Late stage is usually always lethal"

200.    Dr. Aberle: "We have no evidence that we will see any decrease in late-stage cancers, and because of that we may not see any decrease in deaths because those late-stage cancers are usually always lethal."

### NCI Survivorship is...

201.    NCI: "In cancer survivorship covers the physical, psychosocial, and economic issues of cancer, from diagnosis until the end of life.  It focuses on the health and life of a person with cancer beyond the diagnosis and treatment phases.  Survivorship includes issues related to the ability to get health care and follow-up treatment, late effects of treatment, second cancers, and quality of life.  Family members, friends, and caregivers are also part of the survivorship experience." (Ex. 118).

### The NCI: "WHY IS THIS STUDY (NLST) NEEDED IF OBSERVATIONAL STUDIES HAVE SHOWN THAT SPIRAL CT CAN IMPROVE THE SURVIVAL OF PEOPLE WITH LUNG CANCER? (Ex. 115)

202.    NCI:  Some studies have shown that Spiral CT detects smaller abnormalities than chest X-Ray.  However, smaller cancers are not always "early" cancers, and scientists do not know if detecting these small abnormalities, and then treating them, will reduce lung cancer deaths.  To address this question, it is necessary to conduct a randomized, controlled trial such as the NSLT. (Ex. 115).

### Prolonged survival

203.   Dr. Aberle:  "Survival and prolongation of life are not effective outcome measures with screening tests. We cannot relate prolonged survival because of those confounding problems of lead-time, length, and overdiagnosis bias with what is the true measure of an effective screening test, and that is a decrease in the death rate. And, finally, there is a real potential for harms, and we must determine what those harms are by looking at those harms in a carefully controlled environment before we subject people to an unproven - experimental test."

### Dr. Aberle:  "You can't use survival as measure of goodness"

204.   The problem is that you cannot use survival as an indicator of the goodness of a screening test for lots of reasons." Survival is not an appropriate surrogate for mortality reduction because of the difficulty distinguishing between prolonged survival from treatment benefit and prolonged survival from lead-time bias.

### Dr. Aberle: "Survivor statistics are entirely appropriate"

205.   "Survival statistics are entirely appropriate when used to compare differences in treatment modalities in patients with the same stage of a condition who are randomized to different treatment arms.   But using a survival endpoint to refer a screening benefit can be misleading, by diagnosing disease in advance of symptoms, survival will increase even if there is not delay in death. (Ex. 126).

### NCI says survival is the most important measure

206.   NCI:  "Survival refers to the number of people remaining alive at a certain point in time relative to diagnosis. For example, a five-year survival of 60 percent means that 60 percent of peoplewill be alive five years from diagnosis. *Survival is the most important measured used to compare different methods of treatment with one another*.  People with the same disease and

severity of disease treated with different agents (or in different ways);  their survival is measured to determine which treatment is associated with longer survival." (Ex. 123).

### NCI says cannot use survival as measure of benefit

207.   NCI:  *"Survival is not an acceptable measure of how good a screening test is."* (Ex. 121)

### Dr. Aberle:  "Death rates are the only true measure"

208.   Dr. Aberle:  "Lung cancer death rates are the only true measure of whether a cancer screening test works.  And Dr. Henschke's studies do not talk about death rates.  They weren't designed to address death rates. So they can't possibly answer the real question whether CT screening for lung cancer actually is safe, accurate and effective.   They provide other information, but do not answer the ultimate question. They provide information as a base to do further research."

209.   Dr. Aberle: *"Mortality is the gold standard* when you're testing whether a certain diagnostic test is better than another one.  It is not the same as survival, and you cannot surmise death rate from survival."

### Dr. Aberle:  "No clinical value to Spiral CT screening"

210.   It is Dr. Aberle's opinion that there is no demonstrated clinical value to screening for lung cancer with Spiral CT at this point in time. Clinical value would be that the benefits outweigh the risks and the death rates are reduced. Dr. Aberle:  "Right now, under the state of science, we do not know of any screening mechanism for lung cancer that has been proven to cause a reduction in death rates from lung cancer."

### The Purpose of the NLST

211.   The purpose of the clinical trials is to compare compare CT to chest x-ray to determine which will better lower cancer death rates and save lives. (Ex. 114).

212.   Dr. Aberle:  The NLST is not a test of an experimental group getting the procedure versus a control group which does not get the procedure.  The Control group is getting chest x-ray.  A clinical trial of ordinary practice in the United States today would be an experimental group that gets CTs versus people who get nothing.  That would be the primary end point of whether CT really works over getting nothing.

### The design of the NLST is contrary to NCI's RCT guidelines

213.   It is the NCI's position that without a control arm in the randomized control trial (RCT) that does not receive the screening test of interest, it is not possible to determine whether Spiral CT screening lowers death rates in screened populations.  Under this admission by the NCI, the NLST does not have a control arm without Spiral CT screening.  Dr. Aberle and the NCI will not have the evidence of a mortality benefit that Dr. Aberle and the NCI say is essential before they can recommend Spiral CTs.  (Ex. 115).

### In 2010 - we will not have the answer of Spiral CT v. nothing

214.   The primary end point of the NLST is to determine which screening test, Spiral CT or chest x-ray is better at reducing lung cancer specific mortality. At the conclusion of the NLST in the year 2010, there still will not be a firm answer as to CT versus nothing.  Dr. Aberle: "That's not what the NLST is designed to look at."

215.   Dr. Aberle:  "We will be relying on data from the PLCO trial.  And if the PLCO trial shows no difference between chest x-ray and no screening at all, then that will inform us that the use of the chest x-ray in this trial had no impact, and it was as if we were screening for usual care."

## Must have statistical analysis

216.   Dr. Aberle:  "We are still going to have to make "a fairly obvious statistical analysis for the use of Spiral CT alone."

## The consent form

217.   Dr. Aberle:  "The idea of a consent form is that the patient signs indicating that they have read it and been advised of the potential benefits and the potential harms of the procedure. The purpose of the NLST is to determine if screening people at high risk for lung cancer using a Spiral CT scan of the chest can reduce the number of deaths from this disease. This research is being done because it is known that Spiral CT can detect lung cancer when it is very small and before it causes symptoms. CT is technologically the most effective for the early detection of lung cancer nodules available today. *Currently lung cancer is usually diagnosed when it causes symptoms, and by that time prognosis is very poor.*  Earlier detection may lead to fewer lung cancer deaths. The patient is told that when they enter the trial."

## The protocol

218.   The March 4th, 2003, version of the NLST protocol states that the benefits in taking part in the NLST are the same as being screened with Spiral CT without being in the study. The possible benefits include prevention or delay of death from lung cancer.  Prevention of or reduction in symptoms from lung cancer, and milder treatment leading to fewer side effects from treatment for lung cancer.

## Dr. Aberle:  "There's no data"

219.   Q.    "If your hope is correct that CT screening will end up saving lives, then by the delay of making screening available to the smokers and former smokers in the State of Louisiana, we may actually end up failing to save lives that could be saved; correct?"

220.   A:   Dr. Aberle: "And if you're wrong, you may kill a whole lot more than lung cancer will.  There is no study that shows that it kills people or that it helps people or that it reduces deaths.  In fact, there is no data that it prolongs survival yet.  There's no data."

### Dr. Aberle: "Spiral CTs are not reasonable necessary"

221.   It is Dr. Aberle's expert opinion, based upon her research in the area, her background, her education and training, that Spiral CT screening for lung cancer in smokers and former smokers in the State of Louisiana is not reasonably necessary according to contemporary scientific principles. Dr. Aberle: "Based on the state of medical science it is not a close question right now."

### The NCI says that cancer detection is a "Teachable Moment"

222.   The NCI: "The challenges imposed by cancer diagnosis can be life-altering, particularly in terms of changing the health behaviors of patients and survivors.  Indeed, some feel that cancer represents an important *teachable moment* for many cancer victims that can lead to *positive choices* and *healthier lifestyles*.  These changes may improve the emotional outlook and overall health of cancer survivors, and even alter the course of their disease. NCI will support survivorship research to improve the health and quality of life of cancer patients following their diagnosis and initial treatment." *Prepared by the Director of the National Cancer Institute as mandated by the National Cancer Act (P.L. 92-218).* (Ex. 95).

### The NCI addresses the global challenge of cancer improving early detection and diagnosis

223.   The NCI: "For nearly all cancers, treatment options and survival are related to the stage of disease at diagnosis.  The prognosis is generally better and treatment usually more successful if the disease is detected and diagnosed early while it is still localized.  Unfortunately, many cancers have no symptoms at early stages and are not detected until the disease is advanced.

Methods to detect and diagnose cancer include imaging procedures and laboratory tests." (Ex. 111).

### The NIH says that quality of life is the most important factor

224. *Quality of life* is the most important predictor of survival for patients with locally advanced non-small lung cancer, U.S. researchers report. In the past, we've considered the stage of disease or tumor size along with other empirical data to predict how long a patient will survive, but now we know *quality of life* is a critical factor in determining survival. If a patient's *quality of life* increased over time, we saw a corresponding increase in survival. Overall, the study findings underscore the importance of helping patients improve the *quality of life* where we can in order to help them live longer and better. (*A service of the U.S. National Library of Medicine and the National Institutes of Health*). (Ex. 113).

### When lung cancer is not detected by Spiral CT – it is usually too late

225. The NCI: "Currently, when lung cancer is detected, the disease has already spread outside the lung in fifteen (15%) to thirty (30%) of cases. Spiral CT, a technology introduced in the 1990s, can pick up tumors well under 1 centimeter in size, while chest X-rays detect tumors about 1 to 2 centimeters (0.4 to 0.8 inches) in size." It is the NCI's position that conventional wisdom suggests that the smaller the tumor, the more likely the chance of survival but, *no scientific evidence to date has been shown that screening or early detection of lung cancer actually saves lives.* (Ex. 114).

### The NCI: "We must compare chest x-ray to Spiral CT"

226. The NCI agrees that both Spiral CTs and x-rays have been used to detect lung cancer early, but the NLST is needed to compare the two ways of detecting lung cancer: Spiral CTs and standard chest X-ray. (Ex. 119).

### *The gold standard*

227.    The NCI:  The NLST is supposed to show if either test is better at reducing deaths from lung cancer.  The NLST is a randomized, controlled study – the *"gold standard"* of research studies – and is large enough to determine if there is a 20% or greater drop in lung cancer mortality from using Spiral CT compared to chest x-ray.  The trial will also examine the risks and benefits of Spiral CTs when compared to chest x-rays.  Because it is a randomized controlled trial, it is the NCI's position that the NLST will provide evidence needed to determine whether Spiral CT scans are better than chest X-rays at reducing a person's chances of dying from lung cancer. (Ex. 119).

### The U.S. TASK FORCE:  "Lung cancer survival is directly related to early diagnosis"

228.    Lung cancer is fatal in more than 90 percent of affected persons, but survival is directly related to early diagnosis, when patients may not necessarily exhibit any symptoms.  Survival rates range from 70% at stage 1, to 5% at stage 4.  "Current data do not support screening for lung cancer with any method," the task force concluded.  *"These data, however are also insufficient to conclude that screening does not work, particularly for women." (See United States Preventive Services Task Force).* (Ex. 112, 241, 261).

### The NCI knows that early detection leads to greater quality of life

229.    The NCI acknowledged that early detection of lung cancer may reduce symptoms from cancer, result in milder treatment with fewer side effects, or prolong life, but it's the NCI's position that scientists don't know for sure that these things will happen.  It is the NCI's position that data gathered from the NLST will help clarify some of these uncertainties. (Ex.120, 121).

### The NCI says positive observational Spiral CT study (The 1st study)

230.    The NCI acknowledged the results published in October 2006 from a large observational Spiral CT study that show Spiral CTs detect lung cancer at an early stage and may increase the number of people who can be cured. "Currently the vast majority of lung cancer diagnoses are not made until the disease is well advanced and most of these patients die within five (5) years." (Ex. 125).

231.    Among participants in the study who received a diagnosis of lung cancer based on Spiral CT screening and resulting biopsy, **85%** had stage **1** lung cancer (42 of 484); and a statistically estimated 10-year survival among these patients was **88%**.  Among stage **1** patients who underwent surgery within one month of diagnosis, the estimated 10-year survival rate was **92%** percent.  Very few patients in the study have been followed for 10 years. (Ex. 125).

### NCI says it must have NLST to prove mortality benefit

232.    It is the NCI's position that the result of the October **2006** observational study are exciting, but it still is not possible to determine whether CT screening actually decreases *mortality* based on these results.  The NCI claims these findings can't be construed as proof that Spiral CT decreases the risk of death from lung cancer because the study provides only an estimate of *survival* based on a median of 3.3 years of follow-up.  (Ex. 125, 126).

233.    The NCI contends that *survival statistics* are entirely appropriate when used to compare differences in treatment modalities in patients with the same stage of a condition who are randomized to different treatment arms.  The NCI claims that a *survival* endpoint to infer a screening benefit can be misleading because, by diagnosing disease in advance of symptoms, *survival* will increase even if there is no delay in death.  The NCI contends that these results

punctuate the critical necessity of addressing the effectiveness of screening by determining *mortality differences in a randomized trial.* (Ex. 126).

## The NCI says negative observational Spiral CT study (2nd Study)

234.    On March 6, **2007**, the NCI published the findings of another observational Spiral CT study that found no decrease in the number of advanced cases of lung cancer or lung cancer deaths. The NCI compared the results to the previous observational study published in October **2006** (¶ 228) that found Spiral CT screening resulted in a 10-year survival rate of **88%** percent for patients with stage **1** disease and could prevent **80%** of lung cancer deaths.

235.    The NCI concluded that the most likely reason for the discrepancy was the first (1st) study used survival as a measure of outcome while the second (2nd) used *mortality.* The NCI contends that these findings underscore the importance of a prospective trial to address the question of *mortality* as an endpoint." (Ex. 127).

## The Gompertzian growth of cancer

236.    Both normal cells and cancer cells have the same growth pattern and that growth pattern can be measured mathematically. All cancer starts as one cell and then begins to divide. One cell becomes two; two becomes four; four becomes eight and so on. This is called the doubling time of the cancer and can be used to calculate the size of a cancer at a particular period of time. It's an imperfect rule because in reality cancer doubles in size imperfectly.

237.    Sometimes, when there is a problem with mitosis (the reproduction of cells) eight cells divide, but they become 14 not 16. This imperfect growth is Gompertzian growth. Gomperzian growth means, "small things change in size relatively faster." It was calculated by Benjamin Gompertz, a 19th century mathematician. Gompertz measured the growth pattern of healthy cells and cancer cells by a logarithmic plot of growth versus time. Typically, the early growth of

cancer cells is exponential, meaning the growth rate is increasing as the tumor grows larger. So, when a tumor is small, the doubling times tend to be short. As the cancer cells multiply, the growth rate slows down and the cancer grows slower with longer doubling times.

### As cancer grows larger the doubling time slows down

238.    The doubling time slows down because it takes longer for the cancer to double in size as the mass of the tumor increases.  There are many factors that can slow the growth of cancer. Cellular pressure is increased inside the tumor from the surrounding cancer cells.  As the tumor or lesion grows larger, the blood supply decreases, particularly to the central parts of the tumor and the number of cells diving declines.

239.    Some cells die during mitosis.  Some cells die from inadequate nutrition.  The victim's body defenses kill cells and cells are lost during metastases when they move to other parts of the body.  Also, specific growth-controlling mechanisms such as hormones can slow the growth of cancer.  When cancer cells die they release cytoxic products that are harmful to other cells and during the process of moving these waste products out of the tumor, other cells can be affected.

### No exception to Gompertzian growth

240.    Gompertzian growth related to cancer has been known since 1976 and applies to unimpeded tumor growth, but also to regression in response to treatment.  No clinical exception to Gompertzian growth has been found in the last thirty (30) years. (Ex. 141).

### Early detection is a benefit to the plaintiff and class members
### and leads to greater quality of life

241.    Early detection is a benefit to the person, because it is easier to cure small tumors than large tumors.  In smaller tumors the cell survival curve is steeper, which means that the cancer cells are in the reproductive phase, and therefore, more likely to be sensitive to chemotherapy

and radiation therapy. The smaller the tumor, the easier it is to cut it out with a lumpectomy. The smaller the tumor is, the fewer the cells there are to kill, and the easier it is for drugs to gain access to the cancer cells. And the cancer cells are more inherently sensitive to radiation therapy.

## Quality of Life

242.    Mortality benefits are just one of the benefits from detecting cancer early. Detecting cancer early saves money and reduces suffering to the patient. Detecting cancer early allows more treatment options for the patient. Detecting cancer early gives patients the opportunity to have a lumpectomy, rather than having their breasts, lungs or lymph nodes removed. Auxiliary dissection and chemotherapy may be reduced when cancer is detected early. A person's survival rate and life expectancy decreases as the tumor grows larger, because the chance that cancer cells will move via the lymphatic and blood systems to other parts of the body, increases. Cancer is potentially more curable when it is detected early. As cancer grows larger a person's long term survival rate decreases. *"Early detection gives greater control over what happens to a person's body and leads to greater quality of life."* (*U.S. Senator Tom Harken*, U.S. Subcommittee Hearing, 2002). (Ex. 263). *"Every human being of adult years and sound mind has a right to determine what shall be done with his own body..."* (Justice Cardozo: *Schloendorff. v. Society of NY Hospital*, 105 NE 92, 93 (NY 1914)):

## "Incredibly good prognosis"

243.    *"A woman who has cancer detected mammographically has incredibly good prognosis."* (Dr. Donald Berry, University of Texas Cancer Center, Biostatistics Department Chairman, U.S. Senate Subcommittee Hearing, 2002).

Q:      U.S. Senator Harken to Dr. Berry: *Is it true that the earlier you can detect a cancer that the better your prognosis is going to be?*

- 62 -

A:      Dr. Berry:      *There is not question about that, but the question is, does it*

*translate into a benefit for mortality?"* (U.S. Senate Subcommittee Hearing,

2002). (Ex. 263).

**Quality of life benefits ignored in mortality debate**

244.    Q:      U.S. Senator Patty Murray: to Dr. Andrew von Eschenbach, Director of the NCI,

U.S. Senate Subcommittee Hearing, 2002).

"I think there is another issue that has been ignored in this debate, not just the role

that mammography has improved in survival rates, but improving *quality of life* for breast

cancer victims.      Because of mammography, tumors have been detected earlier and

smaller. Now that is a huge benefit that has been lost in this debate because options to

mastectomies significantly improve *quality of life* and allow for a faster and quicker

recovery.    Can you talk a little bit about how mammography and early diagnosis has

impacted *quality of life* for breast cancer patients?" (U.S. Senate Subcommittee Hearing,

2002). (Ex. 263).

**"...less mutilating..."**

245.    A.      Dr. Andew von Eschenbach, Director of the NCI: "Thank you for pointing that

out. I think from the *quality of life* point of view, over and above the mortality argument

discussion that we have been having, that from the patient's point of view that is an

extremely important contribution.    By detecting cancer earlier on, we can then apply

therapies that are less *mutilating* and will have less of an impact on the *quality of life* of

the patient. That in itself is a major goal and objective for us. I concur completely with

your emphasis on that particular aspect of the issue." (*See* U.S. Senate Subcommittee

Hearing, 2002).(Ex. 263).

## COUNT 1.

## BREACH OF MANDATORY DUTY BY NCI

### The public health service

246.    Plaintiff re-alleges and incorporates by reference the previous allegations in this complaint as if set forth fully herein.  The U.S. Public Health Service (PHS) is in the Department of Health and Human Services (DHHS) and is administered by the Assistant Secretary for Health under the supervision and direction of the Secretary.  See 42 U.S.C. § 202.

247.    The NCI and Dr. Aberle, as a Government Official, have a mandatory duty to protect the plaintiff's health.  The secretary of (DHHS) has a duty to formulate national goals, and a strategy to achieve such goals, with respect to health information and health promotion, preventive health services, and education in the appropriate use of health care. 42 U.S.C. §§ 285, 285a, 285a-1, 300u, 300u-1, 300u-2, 300u-3, 300u-4, 300u-5 and 300u-6.  The National Cancer Institute (NCI) publishes cancer screening guidelines to the plaintiff, class members and third party payors that are the standard of care.

248.    The general purpose of the NCI is the conduct and support of research, training, *health information dissemination*, and other programs with respect to the cause, *diagnosis*, prevention, and treatment of cancer, rehabilitation from cancer, and the continuing care of cancer patients and the families of cancer patients. 42 U.S.C. § 285.

249.    Under Title 42 U.S.C. § 285a-1, the Director of the NCI *shall* establish an information and education program to collect, identify, analyze, and disseminate on a timely basis, through publications and other appropriate means, to cancer patients and their families, physicians and other health professionals, and the general public, including the plaintiff, information on cancer research, *diagnosis*, prevention, and treatment.

250.    Under Title 42 U.S.C. § 285 a-1, the Director of the NCI *shall*:

> (2)(A) provide public and patient information and education programs, providing information that will help individuals, including the plaintiff, take personal steps to reduce their risk of cancer, *to make them aware of early detection techniques and to motivate appropriate utilization of those techniques*, to help individuals deal with cancer if it strikes, *and to provide information to improve long term survival.*

251.    The NCI's and Dr. Aberle's failure to recommend Spiral CT screening to detect lung cancer is arbitrary, capricious, and a breach of their mandatory duty, or otherwise not in accordance with the law. The NCI and Dr. Aberle in their conclusion not to recommend Spiral CT screening to detect lung cancer early, have relied solely upon the necessity of performing random clinical trials ("RCTs") to measure possible mortality benefits, which Congress through the Committee on Government Operations in *"Misused Science"* told the  NCI not to rely on when determining cancer screening guidelines. (Ex. 54 - 76, pp. 16, 17, Ex. 74 and 75).

**RCTs do not measure quality of life benefits from detecting cancer at stage 1 (1cm)**

252.    The NCI and Dr. Aberle's refusal to recommend Sprial CT screening to detect lung cancer is not based upon sound science or the best scientific data available.  In Dr. Aberle's and the NCI's conclusion not to recommend Spiral CT screening, the NCI and Dr. Aberly have failed to consider important aspects of the early detection and treatment of cancer: early detection leads to less costly treatment, less suffering, increases the chance of living longer and *"is less mutilating."* (*Dr. Andrew von Eschenbach*, Director of the NCI, 2002)(Ex. 263).

253.    The NCI and Dr. Aberle have offered explanations for their decisions not to recommend Spiral CT screening to detect lung cancer, which runs counter to the evidence before them and

are the same arguments rejected by Congress, through the Committee on Governmental Operations in *"Misused Science,"* and by U.S. Senators in three U.S. Senate Hearings concerning random clinical trials to measure mortality benefits from mammography screening detecting breast cancer in women under age 50. (Ex. 54 – 76, 263).

254.   The NCI's and Dr. Aberle's failure to recommend Spiral CT screening to detect lung cancer and to rely solely upon a random clinical trial to measure mortality benefits is so implausible that it could not be ascribed to a difference in view, or the product of agency expertise. The NCI and Dr. Aberle knew or should have known that they have a duty to plaintiff and class members to protect their health and, if that duty was not done properly, there would be a substantial increase of the risk of harm to plaintiff and class members.

255.   The NCI and Dr. Aberle know that insurance companies, HMOs and other third party payors, like Aetna, (Ex. 16, 17) use the NCI's refusal to recommend Spiral CT screening recommendations to detect lung cancer early, as the standard of care **not** to pay for Spiral CT screening for the plaintiff and class members.

256.   Insurance companies, HMOs and other third party payors, like Atena, must pay for tests and procedures that are the medical standard of care. When the NCI recommends Spiral CT screening to detect lung cancer early for persons at high risk for lung cancer, it will be the medical standard of care and third party payors and plaintiff's insurance company, Aetna, must pay for plaintiff's and class members' annul Spiral CT screening.

257.   Plaintiff has the right to receive truthful information from the NCI. The infringement of plaintiff's right to receive truthful information is sufficient to support plaintiff's standing to enforce and protect that right. In addition, the NCI's refusal to recommend Spiral CTs to detect lung cancer early has caused economic harm to the plaintiff that will be redressed when this

Court orders the NCI to supply truthful information and publish and recommend Spiral CT screening to detect lung cancer early for persons at high risk for lung cancer.

### Defendants' conduct caused failure to diagnose lung cancer

258. Dr. Aberle's, the NCI's and the tobacco defendants' conduct caused the failure-to-diagnose lung cancer for many of class members.

259. Dr. Aberle's, the NCI's and the tobacco defendants' conduct caused many class members to lose the option of a lumpectomy and intervention and treatment at stage one disease (1cm).

260. Dr. Aberle's, the NCI's and the tobacco defendants' conduct caused many class members to have an increased chance of metastasis, a decrease in their long term survival rate, increased the severity of their injuries and treatment and resulted in a greater loss in their quality of life.

### Decreased quality of life and premature death

261. Due to the conduct and fault of the Dr. Aberle, the NCI, and the tobacco defendants besides economic damages, caused many of the members of this class actions to suffer a delay in the diagnosis of lung cancer resulting in diminished quality of life and premature death.

### Georgia Punitive Damages

262. The tobacco defendants' bribing a Government official has caused economic harm to plaintiff in Georgia. Plaintiff and class members are entitled to punitive damages under Georgia Punitive Damage Law. The tobacco defendants' conduct is willful, wanton, malicious, and was done with an entire lack of care that would raise the presumption of conscious indifference to the consequences and constitutes a fraud on plaintiff and class members, the victims of the tobacco defendants' RICO conspiracy. Plaintiff and class members are entitled to punitive damages against the tobacco defendants to deter such conduct in the future.

## COUNT 2.

## Tobacco Defendants' Liability for Violations of the Racketeer

## Influenced Corrupt Organizations Statute

**Violation of Title 18, United States Code, Section 1962(c)**

### Conducting the Affairs of the Enterprise
### Through a Pattern of Racketeering Activity

263.    Plaintiff realleges and incorporates by reference the previous allegations in this complaint as if set forth fully herein and the findings of fact and conclusions of law in the opinion written by Judge Kessler in *U.S. v. Philip Morris USA, Inc.,* 449 F.Supp.2d 1, RICO Bus.Disp.Guide 11, 26 (D.D.C. Aug, 7, 2006)(NO. CIV. A. 99-2496 (GK).

264.    From at least the early 1950s and continuing up to and including the date of the filing of this complaint in the Northern District of Georgia, the tobacco defendants and others known and unknown, being persons employed by and associated with the tobacco enterprise described in this complaint, did unlawfully, knowingly, and intentionally conduct and participate, directly and indirectly, in the conduct, management, and operation of the affairs of the aforementioned tobacco enterprise and the affairs of the National Cancer Institute (NCI), also an enterprise which was engaged in, and the activities of which affected, interstate and foreign commerce, in the conduct management, and operation of the affairs of the enterprises, through a pattern of racketeering activity consisting of numerous acts of racketeering indictable under  18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud), 8 U.S.C. § 201 the Bribery of Public Officials Act; and 18 USC §  1346, Intangible Right to Honest Services Act; including, but not limited to, the acts of racketeering alleged in this Complaint which are incorporated by reference and re-alleged as if fully set forth herein in violation of 18 U.S.C. § 1962 (c).

## The Enterprise Manner and Means

265.   From at least the early 1950s, and continuing up to and including the date of the filing of this complaint, in the Northern District of Georgia and elsewhere, the tobacco defendants and others known and unknown, including agents and employees of the tobacco defendants, collectively have constituted the tobacco enterprise, as that term is defined in 18 U.S.C. § 1961(4), that is, a group of business entities and individuals associated in fact, which was engaged in, and the activities of which affected, interstate commerce and foreign commerce. Each tobacco defendant participated in the operation and management of the tobacco enterprise and the National Cancer Institute (NCI), also an enterprise.

266.   The tobacco enterprise functioned as a continuing unit for more than 45 years to achieve shared goals through unlawful means including the following: (1) to preserve and enhance the market for cigarettes and defendants' own profits, regardless of the truth, the law, or the health consequences to the American public; (2) to deceive consumers into starting and continuing to smoke by maintaining that there was an open question as to whether smoking causes disease, despite the fact that the tobacco defendants knew otherwise; (3) to deceive consumers into starting and continuing to smoke by undertaking an obligation to do everything it its power, including fund independent research, in order to determine if smoking causes cancer or other diseases, while concealing and suppressing relevant research and funding based on *irrelevant research*; (4) to deceive consumers into becoming or staying addicted to cigarettes by maintaining that nicotine is not addictive, despite the fact that tobacco defendants knew that nicotine is addictive; (5) to deceive consumers into becoming or staying addicted to cigarettes by manipulating the design of cigarettes and the delivery of nicotine to smokers, while at the same time denying that they engaged in such manipulation; and (6) to deceive consumers, particularly

parents and children, by claiming that they did not market to children, while engaging in marketing and advertising with the intent of addicting children into becoming lifetime smokers.

267.  The Tobacco enterprise came into existence not later than December 15, 1953, at the meeting at the Plaza Hotel in New York, New York.  The participants agreed at that meeting to conduct a false and misleading public relations and advertising campaign to deceive consumers and others about the health effects of cigarettes in order to protect the profits of Cigarette Companies.

### Shared objective

268.  The central shared objective of defendants has been to maximize their profits.  The tobacco defendants acted in concert to preserve and enhance the market for cigarettes through an overarching scheme to defraud existing and potential smokers.  Indeed, documents recounting the December 1953 meeting at the Plaza Hotel attended by the presidents of defendants Philip Morris, RJR, B & W, Lorillard, and American, a meeting called by American's president to discuss an "industry response" to research that identified cigarette smoking as a cause of lung cancer, report that the executives agreed to jointly sponsor a public relations campaign which was positive in nature and was entirely "pro-cigarettes...." [The executives] were also emphatic in saying that the entire activity was a long-term, continuing program, since they felt that the problem was one of promoting cigarettes and protecting the tobacco defendants from these and other attacks that were expected in the future. Each of the tobacco company presidents attending emphasized the fact that they considered the program to be a long-term one. *U.S. v. Philip Morris*, 449 F. Supp.2d 1, p. 869.

### Formal and informal organizations

269.  The tobacco enterprise operated through both formal and informal organizations, *Id* at

870.  The enterprise functioned as a continuous unit. *Id* at 871. The enterprise engaged in and its activities affected interstate and Foreign Commerce. *Id* at 871. Each defendant was associated with, but distinct from, the enterprise." *Id* at 873.  Each defendant participated in the conduct of the enterprise. *Id* at 875.  Each defendant carried out its participation in the conduct of the enterprise by engaging in a pattern of racketeering activity. *Id* at 878.

### Separate and apart

270.    At all relevant times, the tobacco enterprise has existed separate and apart from the tobacco defendants racketeering acts and their conspiracy to commit such acts.  The Tobacco enterprise had an ascertainable structure and purpose beyond the scope and commission of defendants' predicate acts.  It had a consensual decision making structure that was used to coordinate strategy and unified legal defenses and to contact and hire Dr. Aberle.

### Ongoing organization

271.    The Tobacco enterprise was an ongoing organization whose constituent elements functioned as a continuing unit in maximizing its profits by misleading the public about the health benefits of detecting lung cancer at stage 1 disease (1cm).  The tobacco enterprise continues to actively disguise the nature of defendants' wrongdoing and to conceal defendants' participation in the conduct of the tobacco enterprise in order to minimize their exposure to civil claims in medical monitoring lawsuits to pay for Spiral CT screening to detect lung cancer at stage 1 (1cm) for the victims of the tobacco defendants' RICO conspiracy.

### Association-in-fact enterprise

272.    On information and belief, by frequent and continuous communications among, and coordinated activities of the tobacco defendants and their agents, constituted an association-in-fact enterprise as defined in 18 U.S.C. § 1961(4) at the time of the events alleged in this

complaint that upon information and belief continues to this day.

**Violation of Title 8, United States Code, Section 1962(d);**
**Conspiracy to Violate Title 8, United States Code Section 1962(c)**

### Conspiracy to Conduct the Affairs of the Enterprise
### Through a Pattern of Racketeering Activity.

273.    From at least the early 1950's up to and including the date of the allegations made in this complaint the tobacco defendants and others known and unknown, being persons employed by and associated with the Enterprise did unlawfully and intentionally combine, conspire, confederate, and agree together with each other, and with others whose names are both known and unknown, to conduct and participate, directly and indirectly, in the conduct of the affairs of the aforementioned Tobacco enterprise and the NCI (an enterprise) both engaged in, and the activities of which affected, interstate and foreign commerce, through a pattern of racketeering activity consisting of multiple acts indictable under 18 U.SC.§ 201;  18 U.S.C. §§ 1341, 1343, and 1346, in violation of 18 U.S.C. § 1962(d).

### The enterprise manner and means

274.    Plaintiff realleges and incorporates by reference the previous allegations in this complaint as if set forth fully herein and the findings of fact and conclusions of law in the opinion written by Judge Kessler in *U.S. v. Philip Morris USA, Inc.,* 449 F.Supp.2d 1, RICO Bus.Disp.Guide 11, 26 (D.D.C. Aug, 7, 2006)(NO. CIV. A. 99-2496 (GK).

275.    Each tobacco defendant agreed that at least two acts of racketeering activity would be committed by a member of the conspiracy in furtherance of the conduct of the enterprise.  It was part of the conspiracy the that defendants and their co-conspirators would commit numerous acts of racketeering activity in the conduct of the affairs of the enterprise.

## The Pattern of Racketeering Activity

## Racketeering Acts Related to the Mail and Wire Fraud Scheme

276.    The *Scott* Louisiana medical monitoring and smoking cessation class action lawsuit was filed on May 24, 1996.  In 1997, a class was certified to include all residents who smoked on or before May 24, 1996, and who desired to participate in medical monitoring or smoking cessation programs.  After trial the jury denied the plaintiff's demand for Spiral CT screening, but awarded smoking cessation programs.

## Scheme to save money

277.    From the time of the filing of the complaint in the *Scott* case, May 24, 1996, until the time of hiring Dr. Aberle and through trial in 2003 and appeals until 2007 and continuing until the time of the filing of this complaint in the Northern District of Georgia, the tobacco defendants and others known and unknown did knowingly devise and intende to devise a scheme and artifice to defraud the victims of the tobacco defendants' RICO conspiracy of Spiral CT screening and the detection of lung cancer caused by the tobacco defendants' products at stage 1 disease (1cm), so the tobacco defendants would save money.

## The mail

278.    For the purpose of executing and attempting to execute the scheme and artifice described herein, the tobacco defendants and their co-conspirators would and did:  knowingly place and caused to be placed in any post office or authorized depository for mail matter, matters and things to be sent and delivered by the United States Postal Service to Dr. Aberle in violation of 18 U.S.C. § 1341, including, but not limited the instances set forth in this complaint.

### The wires

279.    For purposes of executing and attempting to execute that scheme and artifice, the tobacco defendants and their co-conspirators would and did knowingly transmit and cause to be transmitted in interstate and foreign commerce by means of wire, email, signs, signals, pictures and sounds (collectively "transmissions") in violation of 18 U.S.C. § 1343, including but not limited to the instances set forth in this Complaint.

## CLASS ACTION

280.    This action is brought and may properly be maintained as a class action pursuant to the provision of the Federal Rules of Civil Procedure Rule 23(a)(1) – (4) and 23(b)(1), 23(b)(2) or 23(b)(3).  Plaintiff, Steven Peoples, brings this action individually and on behalf of all others similarly situated, as representative of the following proposed class:

### The class

281.    All residents of Georgia to the present, who were at high risk for lung cancer from smoking cigarettes, from the day in June 2000 when the Tobacco enterprise called Dr. Aberle and retained her to testify for defendants and against Spiral CT screening for the victims of defendants' RICO conspiracy.

282.    The plaintiff herein and the proposed class, victims of defendants' RICO conspiracy, are a population which, by virtue of their age and history of smoking cigarettes, are at increased risk for developing lung cancer and;

   (a)    were fifty (50) years of age or older;

   (b)    had cigarette smoking histories of twenty pack years or more;

   (c)    whose third party insurance payor did not pay for their annual Spiral CT screening; or

(e)    did pay for Spiral CT screening themselves, like Bernice Jackson.

283.    The relief sought by plaintiffs is the economic cost of the Spiral CTs paid for by the plaintiff and class members and/or the economic cost of the loss of the payments for annual Spiral CTs that Medicare, Medicaid an insurance company, HMO or other third party payor should have paid for, from June 2000, had Dr. Aberle and the NCI recommended Spiral CT screening as public policy.

## Numerosity of Class  - Fed. R. Civ. P. 23(a)(1).

284.    The proposed class is so numerous that the individual joinder of all its members is impracticable under the standard of Fed. R. Civ.P. 23(a)(1).

285.    While the exact number and the identities of class members are unknown at this time and can only be ascertained through appropriate investigation and discovery plaintiff, is informed and believes the class includes  thousands of Georgia residents who are at high risk for lung cancer and have sustained economic damage.

## Existence and Predominance of Common

## Questions of Law and Fact - Fed.R.Civ.P. 23(a) and 23(b)(3).

286.    Questions of law and fact arising out of defendant's conduct are common to all members of the class, and such questions predominate over any questions affecting only individual members of the class.

287.    Common questions of law and fact predominate over individual questions of causation of individual damages and the monetary compensation therefore and defendants' defenses are generally applicable to the entire class rather than to individual claims.

## Typicality of Claims - Fed.R.Civ.P. 23(a)(3).

288.    Plaintiff's claim is typical of the claims of the members of the class.  Plaintiff and all members of the class sustained damages from the defendant's conduct as complained of herein. The losses of each member of the class were caused directly by the tobacco defendants' wrongful conduct alleged herein.

## Adequate Representation - Fed.R.Civ.P. 23(a)(4).

289.    Plaintiff will fairly and adequately protect the interests of the members of the class. Plaintiff has retained an attorney experienced in the prosecution of class actions and in this area of law.

## Superiority - Fed.R.Civ.P. 23(b)(3).

290.    A class action is superior to other available methods for the fair and efficient adjudication of this litigation, since individual joinder of all members of each class is impracticable.  Even if all class members could afford individual litigation, it would be unduly burdensome to the Courts in which the individual litigation would proceed.  Individual litigation magnifies the delay and expense to all parties in the court system of resolving the damages caused by the defendants.

291.    By contrast, the class action device presents far and fewer management difficulties and provides the benefits of unitary adjudication, economies of scale and comprehensive supervision by a single court.  Concentrating this litigation in one forum would aid with judicial economy and efficiency and promote parity among the claims of individual class members as well as judicial consistency.  The conduct of this action as a class action presents fewer management difficulties, conservation of resources of the parties and the court system, and protects the rights of each class member.  Notice of the pendency and of any resolution of this class action can be provided to the class members by publication.

292.    This action is also certifiable under the provisions of Fed. R. Civ. P. 23(b)(1) and/or 23(b)(2) because:

a.      The prosecution of separate actions by the individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual class members, thus establishing incompatible standards of conduct for the defendants.

b.      The prosecution of separate actions by individual class members would create a risk of adjudications that would, as a practical matter, be dispositive of the interests of the other class members not parties to such adjudications or that would substantially impair or impede the ability of such non-party class members to protect their interests and;

c.      The tobacco defendants have acted in respects generally applicable to the class, thereby making appropriate final injunctive relief with regard to the members of the class as a whole.

## PRAYER FOR RELIEF

In the light of the foregoing, plaintiff, Bernice Jackson, requests the following relief:

1.      For preliminary and permanent injunctive and declaratory relief to order the NCI to recommend Spiral CT screening for the early detection of lung cancer;

2.      Award plaintiff, Bernice Jackson and class members all damages contemplated under the Federal RICO law against the tobacco defendants;

3.      Award plaintiff, Bernice Jackson and class members all damages contemplated under the Georgia punitive damages law against the tobacco defendants;

4.      Award plaintiff's and class members' attorney's fees, interest, and costs against the tobacco defendants;

5.      Trial by jury against the tobacco defendants;

6.    Grant such other relief as this court may deem equitable, just, and proper.

May 4th, 2009.

Respectfully submitted,

Robert A. Preston Jr. (Ga. #106070)
308 Roswell Commons
Roswell, Ga. 30076
(404) 844 – 3321
robertpreston07@hotmail.com

Please serve:

The United States Attorney
950 Pennsylvania Ave. N.W.
Washington, D.C. 20530

The National Cancer Institute
6116 Executive Blvd.
Suite 212 MSC 8249
Bethesda, MD. 20892-8349

The National Institutes of Health
9000 Rockville Pike
Bethesda, Md. 20892

The United States Department of Health and Human Services
200 Independence Ave. S.W.
Washington, D.C. 20201

R. J. Reynolds Tobacco Company
Through its agent for service of process:
Corporation Service Company
327 Hillsborough Street
Raleigh N.C. 27603

Altria Group, Inc.
Through its agent for service of process:
CT Corporation system
4701 Cox Road, Suite 301
Glen Allen, Va. 23060-0000

Lorillard Tobacco Company
Through its agent for service of process:
The Prentice-hall Corporation System, Inc.
327 Hillsborough Street
Raleigh N.C. 27603